<hr/>

[No. 18270.    In Bank.—March 29, 1894.]

## HORATIO P. LIVERMORE, RESPONDENT, *v.* E. G. WAITE, SECRETARY OF STATE, ETC., APPELLANT.

CONSTITUTIONAL LAW—AMENDMENT OF CONSTITUTION—STRICT PURSUANCE OF POWER.—The constitution of the state can neither be revised nor amended except in the manner prescribed by itself, and the power which it has conferred upon the legislature in reference to proposing amendments must be strictly pursued.

ID.—CHANGE OF SEAT OF GOVERNMENT.—The declaration that the city of Sacramento is the seat of government of this state is a part of the constitution, and although the section containing it provides for a change of the seat of government by a law to be submitted to the electors of the state, that section may also be amended in the same manner as any other part of the constitution.

ID.—CONDITIONAL AMENDMENT—INVALID ACT.—The proposed amendment of January 2, 1893, to change the seat of government to the city of San Jose was invalid and ineffective, its operative effect being limited upon the uncertain conditions of the donation to the state of not less than ten acres in land, and one million dollars in money, and the approval by the governor, the secretary of state, and the attorney general of the site so donated.

ID.—POWER OF LEGISLATURE TO PROPOSE AMENDMENT.—The constitution does not permit the legislature to propose an amendment that will not upon its adoption by the people become an effective part of the constitution, nor one which if ratified will take effect only at the will of other persons, or upon the approval of such other persons, on some specified act or condition.

APPEAL from a judgment of the Superior Court of Sacramento County.

The facts are stated in the opinion of the court.

CII. CAL.—8

*D. M. Delmas, H. V. Morehouse, Hiram D. Tuttle,* Attorney General *W. H. H. Hart,* and *Deputy Attorney General W. H. Layson,* for Appellant.

*L. T. Hatfield, Grove L. Johnson,* and *Johnson & Johnson,* for Respondent.

HARRISON, J.—At the last session of the legislature a proposition for an amendment to section 1 of article XX of the constitution was adopted by the vote of two-thirds of the members of each house, in the following terms:

"Senate Constitutional Amendment No. 23, submitting to the people of the state of California an amendment to the constitution, amending section 1 of article XX of the constitution of the state of California, relative to changing the seat of government from the city of Sacramento to the city of San Jose.

"The legislature of the state of California, at its thirtieth session, commencing on the second day of January, A. D. 1893, two-thirds of all the members elected to each house of said legislature voting in favor thereof, hereby proposes that section 1 of article XX (miscellaneous subjects) of the constitution of the state of California be amended so as to read as follows:

"SECTION 1. The city of San Jose is hereby declared to be the seat of government of this state, and shall so remain until changed by law; but no law changing the seat of government shall be valid or binding unless the same be approved and ratified by a majority of the qualified electors of the state voting therefor at a general state election, under such regulations and provisions as the legislature, by a two-thirds vote of each house, may provide, submitting the question of change to the people; provided, that the state shall receive a donation of a site of not less than ten acres and one million dollars before such removal shall be had. The governor, the secretary of state, and the attorney general are hereby authorized to approve said site, and upon the approval

thereof, and the payment of one million dollars into the state treasury, the legislature shall provide for the erection of the necessary building and the removal of the seat of government."

The present action was brought by the respondent as a taxpayer and citizen of the state, to restrain the defendant, as secretary of state, from certifying the said amendment to the clerks of the respective counties of the state, and from doing any other act with intent to have the said amendment submitted to the electors of the state, and from incurring any expenses in connection with said amendment, or with any attempt to secure a vote thereon by the people, upon the grounds, as contended by him, that by reason of the failure to comply with certain constitutional requirements, the amendment was never legally adopted, and, also, that, by the terms of the proposition itself, it is inefficient as an amendment to the constitution, and would be inoperative if approved by the people; and that, as a taxpayer and citizen, he is entitled to this relief against the improper expenditure of public moneys.   Judgment was rendered by the court below in favor of the plaintiff, and the defendant has appealed.

The court made findings of fact in reference to the adoption of the amendment substantially as follows: " On the 11th of March, 1893, while the legislature was in evening session, and after the hour of ten o'clock in the afternoon of that day, the proposed amendment was introduced and read in the senate, and, after the roll had been called upon a motion for its adoption, the secretary of the senate announced that twenty-eight senators, including Senators Hart and Voorhies, had voted for the amendment, and seven had voted against it.   Immediately upon the announcement of the vote, what purported to be a true copy of the proposed amendment was transmitted to the assembly, with the announcement that it had been duly adopted by the senate, and at the hour of ten o'clock and fifteen minutes P. M. the senate adjourned.   On the same evening, between the hour of ten

o'clock and fifteen minutes and eleven o'clock P. M., the rules of the assembly were suspended, and the amendment was voted upon in that house and received the votes of fifty-seven members in its favor and seven against it. Immediately thereon one of the assemblymen who had voted in favor of its adoption gave notice of his intention to move for a reconsideration of the vote, and at eleven o'clock P. M. the assembly adjourned. On the 13th of March, the intervening day being Sunday, another assemblyman who had voted for its adoption moved the reconsideration of such vote, and immediately thereafter, upon his motion, the motion to reconsider was laid upon the table, and during the afternoon session of that day the copy of the amendment as sent to the assembly was returned to the senate with the announcement that it had been duly adopted by the assembly; and the legislature adjourned *sine die* without any action by the assembly upon the motion for a reconsideration of the vote by which the amendment had been adopted.

When the senate convened on the 13th of March, the journal was corrected so as to show that Senator Voorhies had voted no upon the adoption of the amendment, instead of aye, as it had been recorded. Thereupon Senator Hart, who had been opposed to the measure, stated, that he had voted no, but had changed to aye, because he had ascertained, before the announcement of the vote, that twenty-seven votes had been cast in favor of the amendment, and that he had changed his vote for the purpose of giving notice of a motion to reconsider, and that when the vote was announced he attempted to make such motion, but an adjournment was had before he could present the motion. He therefore asked to have his vote recorded against the amendment. The matter was referred to the committee on judiciary, which reported that Senator Hart had earnestly endeavored to defeat the measure when before the senate, and recommended that his personal statement be entered upon the journal. The motion of Senator Hart to have the journal corrected was denied, and the journal was

approved, showing twenty-seven votes, including that
of Senator Hart, in favor of the proposed amendment,
and eight votes against it.   The copy voted on in the
assembly differed from that voted on in the senate by
the omission of the words "of this state" in section 1,
immediately after the words "seat of government,"
and in having the word "laws" instead of "law" in the
first sentence.

Upon these facts the respondent in his argument has
presented various reasons for the affirmance of the
judgment, but the conclusion that we have reached
concerning the character and effect of the proposed
amendment renders it unnecessary to consider the
other propositions presented by him.

Article XVIII of the constitution provides two methods
by which changes may be effected in that instrument,
one by a convention of delegates chosen by the people
for the express purpose of revising the entire instru-·
ment, and the other through the adoption by the people
of propositions for specific amendments that have been
previously submitted to it by two-thirds of the members
of each branch of the legislature.   It can be neither
revised nor amended except in the manner prescribed by
itself, and the power which it has conferred upon the
legislature in reference to proposed amendments, as
well as to calling a convention, must be strictly pur-
sued.   Under the first of these methods the entire sov-
ereignty of the people is represented in the convention.
The character and extent of a constitution that may be
framed by that body is freed from any limitations other
than those contained in the constitution of the United
States.   If, upon its submission to the people, it is
adopted, it becomes the measure of authority for all
the departments of government, the organic law of the
state, to which every citizen must yield an acquiescent
obedience.   The power of the legislature to initiate any
change in the existing organic law is, however, of greatly
less extent, and, being a delegated power, is to be strictly
construed under the limitations by which it has been

conferred. In submitting propositions for the amendment of the constitution, the legislature is not in the exercise of its legislative power, or of any sovereignty of the people that has been intrusted to it, but is merely acting under a limited power conferred upon it by the people, and which might with equal propriety have been conferred upon either house, or upon the governor, or upon a special commission, or any other body or tribunal. The extent of this power is limited to the object for which it is given, and is measured by the terms in which it has been conferred, and cannot be extended by the legislature to any other object, or enlarged beyond these terms. The legislature is not authorized to assume the function of a constitutional convention, and propose for adoption by the people a revision of the entire constitution under the form of an amendment, nor can it submit to their votes a proposition which, if adopted, would by the very terms in which it is framed be inoperative. The constitution itself has been framed by delegates chosen by the people for that express purpose, and has been afterwards ratified by a vote of the people, at a special election held for that purpose, and the provision in article XVIII that it can be revised only in the same manner, and after the people have had an opportunity to express their will in reference thereto, precludes the idea that it was the intention of the people, by the provision for amendments authorized in the first section of this article, to afford the means of effecting the same result which in the next section has been guarded with so much care and precision. The very term "constitution" implies an instrument of a permanent and abiding nature, and the provisions contained therein for its revision indicate the will of the people that the underlying principles upon which it rests, as well as the substantial entirety of the instrument, shall be of a like permanent and abiding nature. On the other hand, the significance of the term "amendment" implies such an addition or change within the lines of the original

instrument as will effect an improvement, or better
carry out the purpose for which it was framed.   Expe-
rience may disclose defects in some of its details, or
in the practical application of some of the principles or
limitations which it contains.   The changed condition
of affairs in different parts of the state, or the changes
of society or time, may demand the removal of some
of these limitations, or an extended application of its
principles.   So, too, some popular wave of sociological
reform, like the abolition of the death penalty for crime,
or a prohibition against the manufacture or sale of
intoxicating liquors, may induce a legislature to submit
for enactment, in the permanent form of a constitu-
tional prohibition, a rule which it has the power itself
to enact as a law, but which might be of only tempo-
rary effect.

Section 1 of article XX of the constitution is as fol-
lows:

"The city of Sacramento is hereby declared to be the
seat of government of this state, and shall so remain
until changed by law; but no law changing the seat of
government shall be valid or binding unless the same
be approved and ratified by a majority of the qualified
electors of the state, voting therefor at a general state
election, under such regulations and provisions as the
legislature, by a two-thirds vote of each house, may pro-
vide, submitting the question of change to the people."

The designation of the seat of government of a state
may not properly fall within the definition of a consti-
tution, but as it is a matter which is of public interest,
and concerns the entire state, it is frequently made a
part of that instrument, with the qualification that it
shall so remain until changed by law.   This declaration
that the city of Sacramento is the seat of government
of this state is a part of the constitution, and may be
amended in the same manner as any other portion of
that instrument.   The provision that it shall so remain
the seat of government until changed by law, whether
such law is to be passed like any other law, or with the

limitations prescribed in this section, is immaterial. The section of the constitution in which this provision is contained is not thereby withdrawn from the possibility of amendment. By this section the constitution provides that the seat of government may be changed in the manner therein prescribed, but the mode of effecting such change is not limited to the one thus provided. The legislature might have provided for changing the seat of government to San Jose by passing a law under the provisions of this section, but instead of attempting this course, it has seen fit to seek to accomplish the same result through an amendment to the constitution. Either of these courses was open to its choice, and if the amendment proposed by it were such as is within its power to submit for the approval of the people, the course adopted by it is without objection, for it must be left to the discretion of the legislature to determine which of two methods open to its selection it will adopt.

The proposed amendment is, however, ineffective in accomplishing the object expressed in the title of the proposition. Article XVIII, section 1, of the constitution provides that if a proposed amendment is ratified and approved by the people, it "shall become a part of this constitution." By the terms of the proposed amendment, however, its operative effect is limited upon the donation to the state of not less than ten acres in land and one million dollars in money, and the approval by the governor, the secretary of state, and the attorney general of the site so donated. The section of the constitution which is to be superseded by the proposed amendment fixes the seat of government at Sacramento, and so long as that section remains a part of the constitution the seat of government will remain at Sacramento until changed by law. But if the proposed amendment should be adopted by the people it would obliterate this section from the constitution without leaving any constitutional declaration by which the seat of government would be located in any part of the state. Although the first section of the amendment is

in terms the declaration of an existing fact, the conclud-
ing portion shows that the amendment as a whole has
reference to a future state of facts which may never
come into existence.    The proviso in the amendment
is a limitation upon the declaration that the seat of
government is at San Jose, and postpones the effect of
that declaration until the conditions in the proviso have
been complied with.    Under established rules of con-
struction applicable to constitutions, as well as to stat-
utes, the effect of a proviso to an act is to render the
proviso a limitation upon the body of the act, and to
deprive the substantive part of the act of all effect
inconsistent with the terms of the proviso.

The effect of the amendment, if approved by the peo-
ple, would be that the seat of government will at some
future time be at San Jose, provided a donation of a
million dollars in money and ten acres of land shall
be made.    Until the donation of money and land shall
have been made, and the site donated approved by the
designated officers, the removal of the seat of govern-
ment cannot take place, and the declaration in the first
sentence that, "The city of San Jose is hereby declared
to be the seat of government of this state," would be in-
effectual, for the reason that the amendment would fail
to become an operative part of the constitution.    The
" removal " for which the legislature is directed to pro-
vide, in the last clause of the proposed amendment, is
the removal from Sacramento to San Jose, and not a
subsequent removal from San Jose, as is suggested in one
of the briefs filed herein.    By the existing constitution,
the seat of government is fixed at Sacramento, and is to
remain there until changed, and by the terms of the
proposed amendment there can be no removal except in
accordance with the terms of the proviso upon which it
is conditioned, and which limits the removal from Sacra-
mento to San Jose to those terms.    This removal is con-
ditioned upon the approval of the site that must be
donated before the declarative portion of the section
can have any operation, and is the removal which is

referred to in the proviso which declares that the dona-
tion shall be made " before such removal shall be had."
If any additional argument is needed, it is found in the
current history of the adoption of the amendment, and
also in the entitling of the proposition for the amend-
ment, which declares it to be "relative to changing
the seat of government from the city of Sacramento to the
city of San Jose." The provision in the proposed
amendment for a law providing for its subsequent
change from San Jose would not, upon its approval by
the people, become an operative provision of the consti-
tution, for the reason that that city will not, upon. the
mere approval of the amendment by the people, become
the seat of government; so that the proposition of the
legislature, instead of amending the constitution, either
by changing any of its terms, or adding thereto some
other limitation, would take away the provision which
now exists, and place in its stead a provision which is
incompatible with the requirement that it shall become
a part of the instrument.

The legislature was not authorized by the framers of
the constitution, nor do the terms of that instrument
permit it to propose any amendment that will not, upon
its adoption by the people, become an effective part of
the constitution, nor is it authorized to propose an
amendment which, if ratified, will take effect only at
the will of other persons, or upon the approval by such
persons of some specific act or condition. The amend-
ment proposed is neither a declaration by the people of
a principle or of a fact, nor is it a limitation or a rule
prescribed for the guidance of either of the departments
to which the sovereignty of the people has been in-
trusted. If adopted it would have merely the effect to
present the option to any one so disposed of making a
donation of land and money for the purpose of having
the seat of government at San Jose. Such a proposi-
tion is legislative in character, rather than constitu-
tional, and, being conditional in its terms, would be
ineffective in accomplishing a change of the seat of

government from that already fixed by the constitution. Even if it should be conceded that its approval by the people would incorporate its terms into the constitution, it would take from that instrument the existing declaration fixing the place for the seat of government, and leave the state without any constitutional seat of government until the conditions upon which the declaration rests have been performed. As there is no limitation of the time within which these conditions are to be performed, and no obligation for their performance, it follows that the seat of government would have no established location. But the donation of the money and land does not bring the provision into operation, for, until after the site that may be offered has received the approval of the designated officers, there can be no act of the legislature tending to the removal. Instead, therefore, of there being any declaration by the people of a place for the seat of government, a commission is substituted, whose judgment is to be taken instead of the judgment of the people, and to which is assigned a discretion which should be exercised by the people themselves. We do not mean to say that a legislative provision in a constitution that has been ratified by the people would be nugatory. If placed there, it must be observed by courts and citizens, but, for the purpose of determining the extent of the power conferred upon the legislature to propose amendments to the constitution, we must assume that it is only such amendments as may naturally and reasonably belong to the elements of a constitution. The amendment proposed substitutes for, or rather superadds to, the will of the people another will or judgment, without which its own will can have no effect, and which is, therefore, made the controlling judgment before the amendment can have any operative existence.

As the proposed amendment is, therefore, only a proposition for the people to submit to some other individuals or body to determine whether there shall be a change of the seat of government, we hold that it is not

such an amendment as the legislature has been author-
ized to submit to their votes.   If the people shall at any
time desire a removal of the seat of government from
Sacramento, this result can be readily effected either by
a law passed in accordance with the existing provisions
of the constitution, or by a proposal on the part of the
legislature for such an amendment to the constitution
as will afford them an opportunity to give immediate
effect to their desire by a direct vote upon the question.

The judgment and order of the court below are affirmed.

BEATTY, C. J., FITZGERALD, J., DE HAVEN, J., and
GAROUTTE, J., concur.

PATERSON, J., concurring.—At the argument it was
contended by respondent that the judgment should be
affirmed, because the proposed amendment was never
finally disposed of by the assembly, the whole matter
having been laid on the table; that it was not passed in
the senate by a two-thirds vote of all the members
thereof, the record showing that Senator Hart's vote
ought to have been recorded in the negative; that the
house did not act upon the measure that was passed by
the senate; that the proposed amendment is on its face
void, because in contravention of public morals, being
an offer on the part of the state to abandon its property
at Sacramento, and change its seat of government to
San Jose, for a' bribe or consideration of one million of
dollars and ten acres of land; and that in any event it
is void for uncertainty, there being nothing to show
who is to pay the money or donate the land, or how
long the people will have to wait for a tender of the
property—how many propositions may be made and re-
jected before it can be known where the seat of govern-
ment is to be permanently located—and that no one can
know where the seat of government would be in the
event of a failure of the governor, attorney general, and
secretary of state, or a majority of them, to act upon
any proposition for a site that might be offered.

It must be admitted that there are serious questions involved in some of these contentions.    We agree with the majority in holding that the proposed amendment is ineffective on account of the conditions contained therein, but there is another ground also upon which we desire to place our conclusion.

The language of section 1, article XX, of the constitution is plain.    No law changing the seat of government shall be valid or binding until said law has been ratified by a majority of the qualified electors of the state, voting therefor at a general election; and that law must first receive the sanction of two-thirds of the members of each house, and have been approved by the governor.    No law has ever been passed by the legislature proposing to change the seat of government from Sacramento to San Jose, or providing under what regulations or provisions the question of a change of the seat of government should be voted upon.    The proposed amendment was not put in the form of a bill.    It was neither printed nor read on three several days, nor was the measure declared to constitute a case of urgency.    It was not considered by the governor, therefore it is not a law.    It is true the legislature has, by a general act, provided how proposed amendments to the constitution may be submitted, when no other mode is provided by law for their submission (Stats. 1883, p. 53; Stats. 1891, p. 165), and such provisions may be, and doubtless are, sufficient for the submission of proposed amendments generally; but the seat of government cannot be changed by any law, whether it be an ordinary act, or in the form of a proposed amendment to the constitution, unless it has been regularly introduced, taken the regular course, received the approval of two-thirds of the members of each house, and been approved by the governor.

Appellant claims that section 1, article XX, of the constitution can be amended by proceedings under section 1, article XVIII, of the constitution, and for that purpose the acts of 1883 and 1891, *supra,* are sufficient legislation to submit the proposed constitutional amend-

ment to the people, that sections 1 and 2 of article
XVIII are the only sections relating to amendments,
and that they contain no limitation as to amendments;
that section 1 of article XX provides for the removal of
the state capitol by a law under the constitution *as it
now exists,* while section 1 of article XVIII provides for
amending any section of the constitution, including sec-
tion 1 of article XX.   It is claimed that the court below,
and counsel for respondent, confounded the question of
removal of the state capitol with the question of amend-
ing the constitution.   A glance at the proposed amend-
ment, however, is sufficient to show that its sole object
is a removal of the seat of government from Sacramento
to San Jose.   With the word "Sacramento" substituted
for the word "San Jose," the proposed section is iden-
tical with the provision of the constitution, down to the
condition of removal.   If the framers of the constitu-
tion intended to permit the seat of government to be
removed by the proposal and submission of a constitu-
tional amendment under section 1 of article XVIII, it
is difficult to see why they inserted the provision in sec-
tion 1 of article XX, requiring the proposal to change
the seat of government to be submitted to the people at
a *general* election, under such regulations as *two-thirds
of all the members of each house* should provide by an
act regularly introduced, passed, and approved, as other
acts of the legislature are introduced, passed, and ap-
proved by the governor.   If section 1 of article XX can
be amended in the manner proposed, then the seat of
government may be removed by a simple resolution in-
dorsed by two-thirds of the members elected to each
house, and the regulations under which the question of
removal is to be voted upon may be adopted by a bare
majority of each house, and submitted to the people
at a special election held at *any time.*   But such was
clearly the thing which the framers of the constitution
did not intend to allow to take place, when it provided
that the question must be voted upon at a *general elec-
tion,* and that *no law* changing the seat of government

should be valid until it had received the sanction of two-thirds of the members of each house of the legislature proposing the amendment, and the regulations upon which the question should be submitted were provided by the same number of members, and had been approved by the executive. It was intended that a bare majority of the members of the legislature should not have the power to call for an election upon so important a question. The time for voting upon the question was fixed at a general election, for the purpose of giving the people ample opportunity to fully deliberate upon the question of public policy and public economy necessarily involved in the issue, and when the greatest number of electors would probably assemble at the polls. That it was the purpose of the framers of the constitution to make the subject of the removal of the seat of government an exception to the general rule, and to place a check upon hasty action thereon by requiring the greatest deliberation on the part of those who proposed the amendment, as well as those who should vote upon it, is manifest, not only in the language of the section itself, but in the history of the seat of government in this state and the debates upon the subject in the constitutional convention.

The constitution of 1849 provided that the Pueblo de San Jose should be "the permanent seat of government until removed by law; provided, however, that two-thirds of all the members elected to each house of the legislature shall concur in the passage of such law." Soon after the adoption of that constitution—November 13, 1849—a proposition was made to the legislature offering a large donation to the state if the seat of government should be located permanently at Vallejo, and an act was passed "to take the sense of the people of California upon the subject of the permanent location of the seat of government." (Stats. 1849–50, p. 412.) On February 4, 1851, an act was passed, providing for "the permanent location of the seat of government" at Vallejo, provided M. G. Vallejo should submit a satis-

.factory bond for the performance of his proposition, and furnish a state house for three years. (Stats. 1851, p. 430.) On February 4, 1853, a resolution was passed by the legislature calling upon Vallejo for payment of his proposed donation of three hundred and seventy thousand dollars, and to state his intentions and wishes respecting the location of the seat of government. (Stats. 1852–53, p. 309.) Vallejo, having asked to be released from his obligation on account of his inability to comply with the condition, an act was passed providing that the seat of government on and after February 5, 1853, should be at Benicia, provided Vallejo should release the state from all claims for damages (Stats. 1853, p. 24); and on May 18, 1853, such release having been given, it was provided by "An act for the permanent location of the seat of government," that the "city of Benicia, situated on the straits of Carquines, shall be and remain the permanent seat of government, in accordance with the constitution." (Stats. 1853, p. 217.) On February 25, 1854, the legislature passed an act repealing the former act, and providing that the permanent seat of government should be and remain at the city of Sacramento. Thus the matter rested until the subject again arose in the constitutional convention of 1879. Meantime, however, the state had spent two million five hundred thousand dollars in state capitol buildings and grounds at Sacramento. In the convention Mr. Edgerton introduced a proposition providing that the seat of government should remain at Sacramento until changed by law, but that no law proposing a change should be effectual until submitted to the electors of the state at a general election, and approved by a majority of *two-thirds of all the votes cast*. But the section (sec. 1, art. XX) as proposed by the committee and finally passed, reads as above quoted. During the argument one member of the convention moved to strike out all of the section after the word "remain"; also to strike out the words "by a two-thirds vote of each house." To show the temper of the convention in regard to the

matter, we quote briefly from some of the speeches made during the debate on these proposed amendments:

"*Mr. Wicks.* It should not be left to the caprice of demagogues and politicians. We were cursed by such fickleness in the earlier history of our state. The state, too, has spent a great deal of money here in Sacramento, and has acquired a valuable property."

"*Mr. Barbour.* Suppose Sacramento washes away."

"*Mr. Wicks.* There is no danger of Sacramento washing away. This building never will be washed away."

"*Mr. Ayers.* I do not see any necessity for the amendment. I think that the section as it is now is conservative enough. It requires a two-third vote of the legislature to submit the question. I think that is strong enough to prevent any thing like rash action with reference to the removal of the capitol."

"*Mr. Brown.* Now, I do not see there is any antagonistic feeling against Sacramento as to state capitol, but to attempt to bind the future entirely to this place I think would be wrong, and when the matter is provided for here that by a certain action of the legislature the matter shall be submitted to a vote of the people it seems to me that that should be sufficient."

"*Mr. Schell.* I believe this section is right. I believe that whenever we seek to tear up the foundations of the state capitol, it should be at the instance of two-thirds of the legislature; at least two-thirds of the legislature ought to vote in favor of submitting it to the people first, and then the people may, by a majority vote, remove it. It is not an ordinary question that ought to be submitted to merely a majority of the legislature."

"*Mr. White.* I desire to say that I am going to vote for the amendment of the gentleman from Santa Clara, and that I have no feeling of malice, and if there is any feeling, except by the gentleman himself, I do not know it. We desire merely to give the power to the people to move the capitol at any time they wish. We do not intend to tie down the legislature to a two-thirds vote if we can help it."

"*Mr. Tinnin.* The capitol has been located here at immense expense. It is true, I think, that it was a great mistake in placing it here, but it is here, and it has cost the people of the state a great deal of money, and it should not be removed unless some great calamity or misfortune befalls this city which necessitates that removal."

"*Mr. Tully.* There has been a good deal said here in reference to lobbying, and I do n't know any section that has been adopted, or any thing that this convention could do to encourage lobbying more than to adopt this amendment. There would be a fight every time the legislature met for a majority to move this capitol, perhaps down to Los Angeles, or some other prominent place": Vol. 3, Constitutional Convention, pp. 1388, 1389.

It is a rule of construction applicable to constitutions as well as to statutes that general words are qualified by particular clauses, and that effect must be given to all the provisions of the constitution, if possible, that no word or clause may become redundant; and, as said before, if it had been the intention to permit the removal by resort to the remedy provided in section 1 of article XVIII, there would have been no necessity for the other and more difficult remedy provided by section 1 of article XX. The only alteration attempted by the proposed amendment is of that portion of the section which fixes the seat of government. No principle of the organic law was in any manner affected, and it would be a clear violation, not only of the spirit, but the letter, of the provision that the seat of government shall not be removed except in a particular way, to hold that the purpose may be accomplished in another and easier way. That which cannot be done by direction cannot be done by indirection. Two rules of procedure have been prescribed by the constitution, one for amendments of the organic law, and the other for a change of the seat of government. The contention of respondent, if sustained, would result in the nullification of one provision of the constitution by another; while one section

of the constitution would provide for removal only in a particular way, another section of the same instrument relating to general subjects would authorize the removal in an entirely different manner, and the last clause of the section would accomplish no purpose whatever.    It is conceded, of course, that the people may adopt any amendment of the constitution which is proposed in the manner prescribed by the instrument itself, but neither the legislature nor the people can disregard the provisions which limit and prescribe their power.    It would be competent, of course, for the legislature to propose, and the people to approve, an amendment of section 1 of article XX, to provide a different method from that which now exists of changing the seat of government. The power might be delegated to the legislature alone by a majority vote, but, until some other method has been adopted by amendment to the constitution, the seat of government must remain at Sacramento until it has been changed by a *law* passed, approved, and ratified in the manner now prescribed by the constitution.

If the members of the convention had been told at the conclusion of their debate that, notwithstanding all the care they had taken to secure the deliberate judgment of two-thirds of both houses, and the approval of the governor, or his reasons for disapproval, before the question of removal could be again submitted for decision, even at a general election, the time would come when the legislature would claim the right to precipitate the question at any time it saw fit by *resolution* introduced and passed within an hour, and under resolutions prescribed by a general act, and passed by a bare majority, can any one doubt, in view of the importance they attached to the matter, that they would have declared in express and unmistakable words that the rule prescribed by section 1 of article XVIII should not apply to the subject of removal of the seat of government?    What could the members of the convention have expected to accomplish by the precautions provided for in section 1, article XX ?    They certainly did

not expect those desiring to procure an amendment effecting a change of the seat of government to follow the difficult procedure therein prescribed, when there was an easier way by following section 1 of article XVIII.

McFARLAND, J., concurred in the opinion of Mr. Justice Paterson.