104 So.2d 501 (1958)
Rafael A. RIVERA-CRUZ, Appellant,
v.
R.A. GRAY, as Secretary of State of the State of Florida, Appellee.
Verle A. POPE, Appellant,
v.
R.A. GRAY, as Secretary of State of the State of Florida, Appellee.
Supreme Court of Florida.
July 25, 1958.
Rehearing Denied August 1, 1958.
Matthews & Quinton, Miami, for appellants.
Richard W. Ervin, Atty. Gen., Wilson Wright and Ralph M. McLane, Asst. Attys. Gen., and George John Miller, Miami, for appellee.
Howard W. Dixon and Alfred I. Hopkins, Miami, amici curiae.
THOMAS, Justice.
Separate suits were instituted by Rafael A. Rivera-Cruz and Verle A. Pope against the Secretary of State to enjoin him from having placed on the ballots to be used in the general election of 1958 a proposed revision *502 of the Constitution. The purpose of the litigation was to prevent the needless expenditure of public funds  needless, so it was charged, because the legislature had failed to comply with the provisions of Sec. 2 of Article XVII, F.S.A. in its procedure to present the revision to the electorate. Emphasis should be given the word "revision" which the appellants have chosen as a term for the proposals that will appear on the ballots unless the appellants prevail in this litigation.
This appeal brings here for review the decree of the chancellor holding valid the method, presently to be described, adopted by the legislature, and denying the injunction.
Sec. 2 of Article XVII relates to "Method of revising constitution." Under this portion of the Constitution the members of the Senate and House of Representatives may by a two-thirds vote determine that a revision is necessary and note the action upon their respective journals. It is specified that notice of such action be given for three months before the next election of representatives and that at the election the electors be given the opportunity to vote for or against the revision. If a majority vote favorably, the legislature is charged to provide by law for a convention to revise the Constitution.
The appellants take the position that what is intended to be submitted to the electors at the next general election is a revision of the Constitution in the guise of amendments. Of course, no attempt has been made to follow the procedure outlined in Sec. 2, Article XVII, supra.
It is the contention of the appellee that the part of the Constitution to which we have referred is inapposite and that the pertinent portion is Sec. 1 of Article XVII which contains provisions for proposal of amendments by either branch of the legislature. When these proposed amendments are "agreed to by three-fifths of the members elected to each House" they are published for a specified time and submitted to the electorate at the next general election. If a majority of voters express approval they become parts of the Constitution.
The question, then, is whether the proposals to be printed on the ballots for the impending election are amendments authorized by Sec. 1 or amount to an attempt at revision by using the more simplified procedure governing amendments, and it is complicated by the presence of the word "revision" in the section since it was amended in 1948.
At the outset we observe that Sec. 2 has not been modified since the Constitution of 1885 was adopted by the electorate while Sec. 1 remained unchanged until amended at the general election of 1948. Before that the single word used in Sec. 1 relating to the means of altering the Constitution was "amendments"; the lone word used in Sec. 2 concerning change has, since 1885, been "revision."
It was in the amendment adopted in 1948 that the word "revision" was introduced into Sec. 1. We do not discover in the language of the section as it now stands any intention to abandon or interfere with Sec. 2 dealing solely with "revision." Nor do we find after careful study of both sections that Sec. 1, after amendment, prescribed, an alternative way to revise the constitution. So we decide that two methods of changing the Constitution still obtain and that they may not be intermingled. We are convinced that in the use of the two words "revision" and "amendment" there was no intention so to distinguish them within the section that the revision contemplated by the adoption of Sec. 2 could be accomplished under Sec. 1.
Whereas Sec. 1, before amendment, contained the provision that either branch of the legislature could propose "amendments," after the adoption in 1948 either branch was empowered to "propose the revision or amendment of any portion or portions of [the] Constitution." The "revision or amendment," could affect one or *503 more subjects, but no "amendment" could consist of more than one revised article. In the second paragraph, as in the first, "revision" and "amendment" are used interchangeably and are always in the singular.
The present proposals were embodied in 14 joint resolutions of the legislature of 1957, and are intended to revise the preamble and every article of the Constitution except Article V. In each of the resolutions it is provided that the particular amendment embedded in it shall not be effective unless all amendments, of the preamble and all articles except Article V, are approved by a majority of the votes cast. In the briefs and in the decree this arrangement is called the "daisy chain" system.
Any process of changing the Constitution is cumbersome, made so purposely in order that the organic law may not be easily re-molded to fit situations and sentiments that are relatively transitory and fleeting. This probably was a compelling reason for the procedure specified in Sec. 2 of Article XVII for revision of the Constitution. Nevertheless, the complicated and protracted method of revision would not be adequate for changes of parts of the organic law to meet the needs of progress so amendments of portions were made possible by a comparatively simple procedure. Even this process is so involved that the electors in 1942 adopted an amendment, Sec. 3, Article XVII, providing for emergency alteration of the Constitution. In the Constitutions of 1861 and 1865 even amendments could not originate in the legislature for they contained provisions that "[n]o part of this Constitution shall be altered except by a Convention duly elected." Sec. 1 of the present Constitution, before and after amendment, in our opinion, was meant to deal with the change of parts, not the whole, of the Constitution. Were this not so there would seem to be no need of provisions for a convention.
Four Constitutions of the State preceded the one now in effect. In each of them, Sec. 1, Article XIV of the Constitution of 1838, Sec. 1, Article XIV of the Constitution of 1861, Secs. 1 to 3 of Article XIV of the Constitution of 1865, and Sec. 2 of Article XVII of the Constitution of 1868, were provisions for revision by convention. In the present Constitution we find the same specification for constitutional conventions, and each of the five Constitutions was framed in a convention.
We realize the confusion that would result if some of the present proposed amendments were accepted and some rejected and the practicability therefore of linking them together. But practicalities cannot, however sound, justify a circumvention of a provision of the Constitution for creation and organization of a convention. If the changes attempted are so sweeping that it is necessary to include the provisions interlocking them, then it is plain that the plan would constitute a recasting of the whole Constitution and this, we think, it was purposed to accomplish only by a convention under Sec. 2 which has not yet been disturbed.
Another feature that, in our opinion, renders invalid the "daisy chain" method is the difference in origin of complete and partial changes. Amendments originate in the legislature and the people have the choice only of acceptance or rejection of the ones the legislature submits; in the case of revision, the legislature has primarily only the power of determining that a revision is "necessary." As we have written, the people themselves decide whether or not they desire a revision. If they approve, the legislature then has the duty to enact a law providing for a convention consisting of a membership equal in numbers to the membership of the House of Representatives. But in such instance the law-making body has no voice in formulation of the new Constitution. In other words, under the former system the legislature proposes; under the latter the legislature only expresses a need and, if the declaration is approved by the electorate, carries into effect the will of the people to create a convention.
*504 The people's delegates, elected for the purpose, then weigh proposed provisions, debate their merits, decide what should become and what should not become the organic law. If the method now attempted should be sanctioned, the right of the people to form and develop ideas and forge them into organic rights, guaranties privileges and immunities would be transferred from the people, or the people's delegates, to the legislature. The right of origination by persons set to the task by the electors would be completely eliminated.
A situation similar to the present one was considered by the Supreme Court of California. The constitution of that state contained provisions very much like ours for revision of the constitution by a convention called for the purpose. An attempt was made to effect extensive changes by resorting to provisions governing amendments. The court disapproved the procedure discussing at considerable length the sharp difference between amendment and revision and the reasons the two should not be confused. McFadden v. Jordan, 32 Cal.2d 330, 196 P.2d 787, 789. We disagree with the claim of the Attorney General that there is no analogy between that case and this one. The underlying fundamental principles of amendment and revision with which that court dealt are present in this controversy and the opinion of the California court that they are so unrelated that they cannot be blended coincides with our view on the subject. And it is because of the clear distinction that we reject the argument that the language in Sec. 1, as amended, can be construed as an intention to provide an alternative manner of revising the whole Constitution.
The Attorney General has referred to "the familiar principles that the organic law is supreme and that the people are sovereign." Revision by interlocked amendments would frustrate the sovereign right of the people to re-frame the entire organic law by the means the people themselves proclaimed when they adopted the present Constitution.
Relative to the importance to the people of effecting revision in convention the Supreme Court of California in McFadden v. Jordan, supra, quoted with approval the statement in a former opinion, Livermore v. Waite, 102 Cal. 113, 36 P. 424, that by that method "`the entire sovereignty of the people is represented * * *.'" The court further distinguished, by quoting from Livermore v. Waite, supra, between revision in convention, in which the people through their delegates may frame a constitution free of any limitation, except such as is imposed by the Constitution of the United States, and an amendment originating in the legislature which is "`such an addition or change within the lines of the original instrument as will effect an improvement or better carry out the purposes for which it was framed.'" (Italics supplied.)
The course now attempted, if sanctioned, would amount to a circumvention of Sec. 2 of Article XVII. Sec. 1 of the Article can be, and should be, construed so as to preserve Sec. 2.
That the present attempt is one to rewrite the Constitution in toto there can be no doubt. The proposal carries its own label for in Sec. 1 of Article XIII it is provided that "[t]his constitution * * * as adopted and as thereafter amended, * * * shall bear the short title: Florida Constitution of 1958. When the Preamble and Articles * * * hereof become effective all articles of the constitution of 1885 except Article V shall be superseded thereby and are repealed * * *." (Italics supplied.)
The last sentence of Sec. 1 of Article XVII now in force seems to us to contradict the assertion that it affords, in the manner now attempted, an added way to overhaul the Constitution for it reads that if a majority of the electors "voting upon the amendment adopt such amendment [both in the singular] the same shall become a part of this Constitution." (Italics supplied.)
The appellee argues that the letter of the organic law has been followed because no *505 amendment consists of "more than one revised article" which is the requirement of Sec. 1 of Article XVII. The purpose of this requirement is to permit an elector to vote intelligently for the amendments he favors and against the ones he disapproves. Under the "daisy chain" system all amendments must be accepted or all will be rejected, therefore the right of the elector to approve one or few will become worthless unless all others, including the ones he rejects, receive a majority vote of approval. When the requirement for separate amendments is ostensibly met but approval is made inseverable, substance is sacrificed to form.
We conclude that the manner of presenting the so-called amendments to the electorate is contrary to the spirit and intent of the Constitution and, consequently, that no public monies should be spent for the purpose.
Nothing in this opinion is meant to deal with the validity of House Joint Resolution 32-X, Extraordinary Session of the Florida Legislature 1957. That matter was not adjudicated in the chancery court and was not presented here.
Reversed with directions to enjoin the expenditure for placing the 14 proposed amendments on the ballot.
HOBSON and O'CONNELL, JJ., concur.
TERRELL, C.J., and THORNAL, J., concur specially.
TERRELL, Chief Justice (concurring specially).
I concur in the opinion and judgment of Mr. Justice THOMAS but I take a more objective course to the conclusion reached. I construe Article XVII to provide three methods for amending or revising the Constitution. Section 1 defines the pattern for amending any article of the Constitution. Section 2 defines the pattern for revising the Constitution and Section 3 defines the pattern for amending the Constitution in the face of an emergency. We are not concerned with Section 3 at this time because there is no finding of an emergency by the legislature.
If the legislature determines to amend any article or articles of the Constitution, it is bound by the pattern defined in Section 1. If three-fifths of the members elected to each house agree to the proposed amendment, it must be entered upon their respective journal and published as directed. If a majority of the electors approve the amendment at the next general election, it becomes a part of the Constitution.
If the legislature by vote of two-thirds of the members of both houses determines that a revision of the Constitution is necessary, such determination shall be entered upon their respective journals and published as directed. The electors of the state may at the next general election vote on the question of whether or not a revision of the Constitution is necessary. If a majority of the electors vote to revise the Constitution, the legislature shall then provide for a convention to accomplish the revision, said convention to be held within six months from passage of the act providing for it and to be composed of a number of members equal to those composing the house of representatives. The members of the convention are apportioned among the counties in the same manner as members of the house of representatives. It is, therefore, clear that the Constitution may be amended by articles or the entire instrument may be revised.
Whether the legislature attempted to amend by articles as provided by Section 1 or to revise the whole instrument as provided by Section 2 does not in terms appear but a reading of the journals of both houses and procedure followed by them convinces me that they had in mind a revision of the entire instrument. When the Constitution uses the word "amendment" it has reference to an article or articles, while the word "revision" relates to the whole instrument. In either event, they were totally without *506 authority to limit the action of the people with such a devise as the "Daisy Chain." The Constitution is the people's document. They may bind the legislature within the confines of democratic polity, but the legislature can limit the people only in the manner authorized by the Constitution. As said George Mason in the Virginia Declaration of Rights, adopted June 12, 1776: "That all power is vested in, and consequently derived from, the people; that Magistrates are their trustees and servants, and at all times amenable to them." The same concept of sovereignty was embodied in the preamble to the Constitution of the United States, the preamble to the Constitution of the State of Florida and Lincoln clothed it with immortality in his classic  "government of the people, by the people and for the people shall not perish from the earth."
In amending any article or articles of the Constitution, the legislature is limited by the directives in Section 1; in revising the Constitution it is limited by the directives in Section 2. There is nothing in either section that could in the remotest sense be said to approve the "Daisy Chain" as a devise to amend an article or to revise the whole instrument. In adopting such a devise the legislature departed from the directives given them. Having resolved that a revision of the Constitution "is necessary," it became their duty to advertise that action as directed and give the people a chance to approve or reject their action. If the people approve, then it became the legislative duty to provide a convention for the representatives of the people "to revise the Constitution."
Instead of following the mandate of the people thus given the legislature, whose "trustees and servants" they were, set up the "Daisy Chain" composed of a series of mandates and in effect told the people  take it as we offer it to you or you can have none of it. To one whose feet have been consistently tangled in the grassroots of Jeffersonian democracy, such an order was not only impertinent but had the aroma of an exotic out of the Soviet Union or other totalitarian state.
It therefore follows that the "Daisy Chain" was not only devoid of constitutional authority but it was further unconstitutional in that the legislature overlooked its function of preparing something for the people to consider and set itself up as the real constitutional maker.
For all of which I agree to the judgment of reversal with directions to enjoin the expenditure.
THORNAL, Justice (concurring).
I have concurred in the opinion prepared by Mr. Justice THOMAS for the very cogent reasons which he has advanced in support of the conclusion reached.
It appears to me that the conclusion which we herewith reach is further strengthened by a consideration of the legislative history of House Joint Resolution No. 118, 1947 Session, Florida Legislature, which was the legislative resolution proposing the amendments to Section 1, Article XVII, Constitution of Florida, which amendments were approved by the electorate in 1948. House Joint Resolution No. 118 of 1947 was introduced and sponsored by the late Honorable Perry E. Murray. House Journal, 1947 Session, Florida Legislature, p. 63. As originally introduced in the House of Representatives by Mr. Murray, the first paragraph of proposed amended Section 1, Article XVII, supra, read as follows:
"Section 1. Either branch of the Legislature, at any regular session, or at any special or extraordinary session thereof called for such purpose either in the governor's original call or any amendment thereof, may propose the revision or amendment of any portion or portions of this Constitution. Any such revision or amendment may relate to one subject or any number of subjects."
When the resolution was under consideration by the House of Representatives, the *507 last sentence of the above quoted paragraph was amended to read as follows:
"Any such revision or amendment may relate to one subject or any number of subjects, but not to exceed the subjects covered by one article of the Constitution." (Emphasis added.)
See House Journal, supra, p. 130.
When the resolution was under consideration by the Senate, the last-quoted sentence was again amended to read as follows:
"Any such revision or amendment may relate to one subject or any number of subjects, but no amendment shall consist of more than one revised article of the Constitution." (Emphasis added.)
Senate Journal, 1947 Session, p. 728. As so amended in the Senate, House Joint Resolution No. 118 was ultimately approved by the people.
An analysis of the subject provision will reveal that, as originally introduced, it provided that any proposed revision or amendment could relate to one subject or any number of subjects. It appears to me that it was obviously the intent of the proponents of the amendment that it would constitute an alternative method for revising the Constitution by way of a multi-subject amendment that would originate in the Legislature. However, in proceeding through the legislative process the possibility of accomplishing this objective was completely eliminated when the original proposal was ultimately amended by the provision that "no amendment shall consist of more than one revised article of the Constitution." In other words, the legislative history of amended Section 1, Article XVII, Florida Constitution, clearly reveals that the original proponents intended to provide a plan of constitutional revision which would originate in the Legislature as an alternative to the Convention method provided by Section 2 of Article XVII. However, before the proposal completed the legislative process the possibility of accomplishing this result was destroyed by the addition of language which limited the subject of any amendment under said Section 1, Article XVII, to one revised article.
The plan as ultimately evolved became popularly known as "the article by article plan" for accomplishing constitutional revision. See Miami Law Quarterly, Vol. 3, p. 225, The Case for Constitutional Revision in Florida by Thomas E. David.
A most helpful contemporary analysis and explanation of House Joint Resolution No. 118 of 1947, which ultimately became amended Section 1, Article XVII, Florida Constitution, will be found in Florida Law Journal, March 1948, p. 56, in an article entitled "Recent History and Present Prospects of Efforts to Revise State Constitution" by the late Honorable Perry E. Murray, then Speaker-elect of the House, and as stated above was the original proponent of House Joint Resolution No. 118. Although, of course, not conclusive, I think Mr. Murray's comments are persuasive and certainly helpful in our effort to interpret Section 1, Article XVII, supra. In the article mentioned, Mr. Murray stated that the Resolution as originally proposed was intended "to provide that any amendment might revise any and all portions of the Constitution." He then commented that after House Joint Resolution No. 118 was amended on the floor of the Legislature, the ultimate result was that the proposed revisions or amendments of the Constitution were so limited "that no amendment can consist of more than one revised article of the Constitution."
As so ably pointed out by Mr. Justice THOMAS, it is perfectly clear that the so-called "daisy chain" proposal for revision with its mandatory interlocking requirements is directly violative of that portion of Section 1, Article XVII, Florida Constitution, which provides that no proposed amendment "shall consist of more than one revised article of the Constitution." The legislative development of Section 1, Article *508 XVII, Florida Constitution, as now in effect, as well as the contemporary comments and explanations by those who were thoroughly familiar with the amendment at the time of its proposal and approval appear to me to add substantial weight to the conclusion that the Florida Constitution cannot be revised under Section 1, Article XVII, except on a separate individual non-interlocking article by article basis.
For the reasons set forth in the opinion prepared by Mr. Justice THOMAS, as well as the foregoing, I therefore concur.
TERRELL, C.J., concurs.