238 So.2d 824 (1970)
Tom ADAMS, Appellant,
v.
William D. GUNTER, Jr., Appellee.
No. 38971.
Supreme Court of Florida.
July 30, 1970.
Rehearing Denied September 21, 1970.
*825 Earl Faircloth, Atty. Gen., Wilson W. Wright, and Rodney Durrance, Jr., Asst. Attys. Gen., for appellant.
P.D. Thomson and Joseph Z. Fleming, of Paul & Thomson, Miami, and Robert F. Evans, Jr., Orlando, for appellee.
DREW, Justice.
William D. Gunter, Jr., as a taxpayer citizen of the State of Florida, prepared and presented to Tom Adams, Secretary of State of Florida, a "Petition for a One House Legislature Pursuant to Article XI, Section 3: Initiative"[1] for approval as to *826 form and content before proceeding with the circulation thereof. The Secretary of State declined to approve the petition, whereupon these proceedings for declaratory decree were instituted under Chapter 86, Florida Statutes 1969, for the purpose of resolving the controversy between the parties.
The trial court held:
"1. That the petition submitted by Respondent proposing an amendment by initiative to Section 1, of Article III, of the Constitution of the State of Florida, as amended in 1968, is valid and meets the Constitutional requirements of Article XI, Section 3.
"2. That upon proper signature of petition by the required number of electors, and filing with the Secretary of State in conformity with Article XI, Section 3, of the Constitution, the proposed amendment is in proper form to be submitted to the electors at the next general election held more than ninety (90) days after it is filed."
This direct appeal is from such judgment which construes controlling provisions of the Florida Constitution[2] and presents for the first time the question of whether an initiative petition proposing an amendment to the Constitution of 1968 is defective and unauthorized when the proposed amendment would amend, modify, change or otherwise affect several other provisions of the same constitution.
Article XI of the Constitution of 1968 contains five sections, all relating to amendments. For clarity in the discussion which follows, Article XI in its entirety is set forth below:
"ARTICLE XI
AMENDMENTS
"§ 1. Proposal by legislature
Amendment of a section or revision of one or more articles, or the whole, of this constitution may be proposed by joint resolution agreed to by three-fifths of the membership of each house of the legislature. The full text of the joint resolution and the vote of each member voting shall be entered on the journal of each house.
"§ 2. Revision commission
(a) Within thirty days after the adjournment of the regular session of the legislature convened in the tenth year following that in which this constitution is adopted, and each twentieth year thereafter, there shall be established a constitution revision commission composed of the following thirty-seven members:
(1) the attorney general of the state;
(2) fifteen members selected by the governor;
(3) nine members selected by the speaker of the house of representatives and nine members selected by the president of the senate; and
(4) three members selected by the chief justice of the supreme court of Florida with the advice of the justices.
(b) The governor shall designate one member of the commission as its chairman. Vacancies in the membership of the commission shall be filled in the same manner as the original appointments.
(c) Each constitution revision commission shall convene at the call of its chairman, adopt its rules of procedure, examine the constitution of the state, hold public hearings, and, not later than one hundred eighty days prior to the next general election, file with the secretary of state its proposal, if any, of a revision of this constitution or any part of it.
"§ 3. Initiative
The power to propose amendments to any section of this constitution by initiative is reserved to the people. It may *827 be invoked by filing with the secretary of state a petition containing a copy of the proposed amendment, signed by a number of electors in each of one half of the congressional districts of the state, and of the state as a whole, equal to eight per cent of the votes cast in each of such districts respectively and in the state as a whole in the last preceding election in which presidential electors were chosen.
"§ 4. Constitutional convention
(a) The power to call a convention to consider a revision of the entire constitution is reserved to the people. It may be invoked by filing with the secretary of state a petition, containing a declaration that a constitutional convention is desired, signed by a number of electors in each of one half of the congressional districts of the state, and of the state as a whole, equal to fifteen per cent of the votes cast in each such district respectively and in the state as a whole in the last preceding election of presidential electors.
(b) At the next general election held more than ninety days after the filing of such petition there shall be submitted to the electors of the state the question: `Shall a constitutional convention be held?' If a majority voting on the question votes in the affirmative, at the next succeeding general election there shall be elected from each representative district a member of a constitutional convention. On the twenty-first day following that election, the convention shall sit at the capital, elect officers, adopt rules of procedure, judge the election of its membership, and fix a time and place for its future meetings. Not later than ninety days before the next succeeding general election, the convention shall cause to be filed with the secretary of state any revision of this constitution proposed by it.
"§ 5. Amendment or revision election
(a) A proposed amendment to or revision of this constitution, or any part of it, shall be submitted to the electors at the next general election held more than ninety days after the joint resolution, initiative petition or report of revision commission or constitutional convention proposing it is filed with the secretary of state, unless, pursuant to law enacted by the affirmative vote of three-fourths of the membership of each house of the legislature and limited to a single amendment or revision, it is submitted at an earlier special election held more than ninety days after such filing.
(b) Once in the tenth week, and once in the sixth week immediately preceding the week in which the election is held, the proposed amendment or revision, with notice of the date of election at which it will be submitted to the electors, shall be published in one newspaper of general circulation in each county in which a newspaper is published.
(c) If the proposed amendment or revision is approved by vote of the electors, it shall be effective as an amendment to or revision of the constitution of the state on the first Tuesday after the first Monday in January following the election, or on such other date as may be specified in the amendment or revision."
Of assistance also in the resolution of this question are the following excerpts from the Minutes of the Interim Constitutional Revision Committee, viz:
"Section 3 discussed next. The section was approved as it reads on page 71 of October 30 draft; however, there is a flag to Style and Drafting that such subcommittee should prepare amendments to be introduced on floor during special session to correct language applying to revision of entire articles as well as amendments to a section. Section 3, until so amended, will read:
Section 3. INITIATIVE.  The power to propose amendments to any section of this constitution by initiative is reserved to the people. It may be invoked by filing with the secretary of *828 state a petition containing a copy of the proposed amendment, signed by a number of electors in each of one half of the congressional districts of the state, and of the state as a whole, equal to eight per cent of the votes cast in each of such districts respectively and in the state as a whole in the last preceding election in which presidential electors were chosen." [Excerpt from Minutes of the Interim Constitutional Revision Committee on October 30, 1967.]
"In Article XI, Representative Pettigrew moved that on page 63, Section 3, line 7, the word `section' be amended to read `article.' Senator Friday spoke in opposition to this amendment. Representative Reed offered substitute motion to strike the words `any section of' on line 7. Representative Sessums offered an amendment to the substitute motion by inserting the words `article or' before the word `section.' Mr. Pettigrew withdrew his motion. Mr. Reed's substitute motion as amended by Mr. Sessums would amend the sentence to read: `The power to propose amendments to any article or section of this constitution by initiative. * * *' Representative Eddy spoke in opposition to all these amendments and requested that the language remain as it appears in the December 11 Draft. Vote was taken on the motion to amend. MOTION FAILED by vote of 6 yeas and 13 nays (see Roll Call No. 6 attached). Vote taken on motion to amend line 7 by striking the word `section' and inserting `article.' MOTION FAILED by voice vote. Representative Wolfson moved that Article XI be adopted as the recommendation of the committee. MOTION CARRIED by voice vote." [Excerpt from Minutes of the Interim Constitutional Revision Committee on June 17, 1968.]
Of pertinence also is the distinction between the words "amend" and "revise." Webster's Collegiate Dictionary, Fifth Edition, defines these words as follows: "Amend  * * * To change or modify in any way for the better; to improve; to better; hence, to change or alter in any way, esp. in phraseology; * * * Specif., in parliamentary procedure, to alter (as a bill) formally by some addition or modification" and "Revise  * * * to look at or over again in order to correct or improve; as to revise a printer's proof. To make a new, improved, or up-to-date version of; as to revise the game laws. Act of revising; revision." That these distinctions were debated and considered at length in selecting the language to be incorporated in Article XI is clear from the Minutes of the Constitutional Revision Committee quoted above.
It has been suggested that these proceedings, brought under the provisions of the Declaratory Judgment Act,[3] are premature and present no question determinable under the Declaratory Judgment Act. The argument in this connection is largely predicated upon the decision of this Court in Bryant v. Gray.[4] The same question was raised with reference to the proceedings which culminated in the decision of this Court on June 26, 1970, in the case of Holley v. Adams, Fla., 238 So.2d 401. In this decision we swept aside the objections, holding that such action was appropriate and that the circuit court had jurisdiction. What we said in Holley is applicable here. While our Declaratory Judgment Act does not require that there be an actual controversy to form a basis for invoking the provisions of such statute, we find that such a controversy does actually exist in this case. Appellee Gunter presented his petition to the Secretary of State and has alleged in the complaint that the Secretary of State refused to approve it because of alleged legal insufficiencies. To resolve the question these proceedings were instituted. The purpose of the litigation is not only to save the appellee Gunter great *829 sums of money in the promotion of the initiative petition but to resolve the highly pertinent public question involved. The trial court had jurisdiction to entertain the proceedings and enter the decree which is the subject of this appeal.
The provisions of the 1968 Constitution herein quoted at length had no counterpart in any of the previous constitutions of the state.[5] Amendments to the present Constitution may be brought about as follows:
(1) The Legislature may propose an amendment of "a section" or "revision of one or more articles" or "the whole" Constitution;
(2) Ten years after the adoption of the Constitution and every twenty years thereafter a Constitutional Revision Commission, established by the Constitution, shall meet and at such meeting may propose for adoption "a revision of this Constitution or any part of it."
(3) The electors of the state may propose amendments to "any section" of the Constitution by initiative; and
(4) The electors may by petition containing a declaration that a constitutional convention is desired call a convention to consider a revision of the "entire Constitution."
The Constitution is divided into twelve Articles and each Article is divided into numbered Sections. Throughout Article XI the words "amendment" and "revision" are used to denote entirely different things. The words were carefully and deliberately selected and it is clear from the language of Article XI that the people have reserved the right to bring about an amendment to any section of the Constitution by following the provisions set forth therein. The people have also reserved unto themselves the power to bring about a complete revision of the entire Constitution. It is equally clear from Article XI that where more than one section of the Constitution is to be amended it is called a revision, and such revision contemplates deliberative action of either the Legislature or a convention duly assembled in order to accomplish harmony in language and purpose between articles and to produce as nearly as possible a document free of doubts and inconsistencies. Deliberation, discussion, and drafting is a part of the scene of parliamentary procedures and essential when more than one section of a constitution is to be amended.
This case presents a classic example of why Article XI was so framed. Assuming that the petition herein should receive the approval required and become a part of the Constitution, it would be immediately necessary to amend numerous other provisions of the Constitution. This fact is recognized in the proposal itself. Paragraph (c) thereof provides that the Legislature in the General Election of 1972 "shall propose * * * such further amendment to this Constitution and shall pass such laws as shall be necessary to implement this amendment." The quoted provision in itself condemns the proposal. It is the type of amendment which this Court condemned in Rivera-Cruz v. Gray, supra, which concerned the so-called "daisy-chain amendments" to the Constitution of 1885. In that case this Court enjoined the submission to the electors of the proposals to revise the Constitution by submitting to the people interlocking amendments to each article thereof (except Article V), with the provision that unless all articles were adopted the election failed. We held in that case that such an attempt to amend the Constitution amounted to a revision without conforming to the then provisions of the Constitution of 1885, concerning revision. We said: "When the Constitution uses the word `amendment' it has reference to an article or articles, while the word `revision' *830 relates to the whole instrument."[6] Our present Constitution is decidedly analogous. This document uses the word "amendment" with reference to a section rather than an article as did the 1885 Constitution.
Mr. Justice Thomas in writing for the Court in Rivera-Cruz used the following language which is pertinent to the disposition of the problem here:[7]
"If the changes attempted are so sweeping that it is necessary to include the provisions interlocking them, then it is plain that the plan would constitute a recasting of the whole Constitution and this, we think, it was purposed to accomplish only by a convention under Sec. 2 which has not yet been disturbed."
The proposal here to amend Section 1 of Article III of the 1968 Constitution to provide for a Unicameral Legislature affects not only many other provisions of the Constitution but provides for a change in the form of the legislative branch of government, which has been in existence in the United States Congress and in all of the states of the nation, except one, since the earliest days. It would be difficult to visualize a more revolutionary change. The concept of a House and a Senate is basic in the American form of government. It would not only radically change the whole pattern of government in this state and tear apart the whole fabric of the Constitution, but would even affect the physical facilities necessary to carry on government.
Without attempting to enumerate all of the sections of the Constitution which would be affected to a greater or lesser degree by the adoption of this amendment, it is significant to note the following:
1. Section 2 of Article III would have to be rewritten;
2. Sections 3(c) (1), 3(d), 3(e), and 3(f) of Article III would have to be revised to be applicable to the Unicameral theory;
3. Sections 4(a) (b) (c) and (d) of Article III would require revision;
4. Section 5 of Article III would require revision;
5. Sections 8(b) and (c) of Article III would require revision;
6. Section 9 of Article III would require revision;
7. Section 11(a) (21) of Article III would require revision;
8. Sections 15(a) (b) and (c) of Article III would require reconsideration and revision;
9. Substantially all of Section 16 of Article III regarding legislative apportionment would require revision;
10. Perhaps the most sweeping change would have to be made in Section 17 of Article III regarding impeachment. This section would have to be completely recast and revised;
11. Section 6(a) of Article IV would require reconsideration, as would Section 7(b) of the same article;
12. In Article V it would be necessary to change the language in Section 13 and 13(a);
13. Section 1 of Article X relating to amendments to the United States Constitution would require change;
14. It would require a complete revision of Article XI relating to the method of amending the constitution because of the repeated references to the House and Senate throughout that article;
15. Sections 9, 11, 12 and 14 of Article XII would have to be amended.
*831 It is clear from the recitations above that the power reserved to the people to amend any section of the Constitution, includes only the power to amend any section in such a manner that such amendment if approved would be complete within itself, relate to one subject and not substantially affect any other section or article of the Constitution or require further amendments to the Constitution to accomplish its purpose. There are many sections of the Constitution which would lend itself to such amendments; for instance, in Article X of the Constitution there are thirteen sections. An amendment to most, if not all, of these sections could be complete within itself and not substantially affect other provisions of the Constitution or require further amendments thereof. There are many other similar sections in the document.
If it should become necessary in the course of events for the people to bring about such cataclysmic change as that which would result in the adoption of the amendments here under consideration, or if the Legislature should fail or refuse to act, the people have reserved unto themselves a means of bringing about such a revision by initiating under the provisions of Section 4 of Article XI a convention to consider a revision of the entire Constitution. This Section is available to the people to bring about a Unicameral Legislature if that is their desire.
In Rivera-Cruz, supra, this Court cited McFadden v. Jordan, 32 Cal.2d 330, 196 P.2d 787, 789. This California case involved a purported initiative amendment to the Constitution of California, the result of which would be to substantially alter or repeal at least fifteen of the twenty-five articles of the California Constitution. The following language used in that decision is highly germane and pertinent:[8]
"The proposal is offered as a single amendment but it obviously is multifarious. It does not give the people an opportunity to express approval or disapproval severally as to each major change suggested; rather does it, apparently, have the purpose of aggregating for the measure the favorable votes from electors of many suasions who, wanting strongly enough any one or more propositions offered, might grasp at that which they want, tacitly accepting the remainder. Minorities favoring each proposition severally might, thus aggregated, adopt all. Such an appeal might well be proper in voting on a revised constitution, proposed under the safeguards provided for such a procedure, but it goes beyond the legitimate scope of a single amendatory article. There is in the measure itself no attempt to enumerate the various and many articles and sections of our present Constitution which would be affected, altered, replaced, or repealed. It purports only to add one new article but its framers found it necessary to include the omnibus provision (subdivision (7) of section XII) that `If any section, subsection, sentence, clause or phrase of the constitution is in conflict with any of the provisions of this article, such section, subsection, sentence, clause or phrase is to the extent of such conflict hereby repealed.'
* * * * * *
"We cannot accept such an arbitrary and strained minimization of difference between amend and revise. The differentiation required is not merely between two words; more accurately it is between two procedures and between their respective fields of application. Each procedure, if we follow elementary principles of statutory construction, must be understood to have a substantial field of application, not to be (as argued in intervenors' Answering Memorandum) a mere alternative procedure in the same field. Each of the two words, then, must be *832 understood to denote, respectively, not only a procedure but also a field of application appropriate to its procedure. The people of this state have spoken; they made it clear when they adopted article XVIII and made amendment relatively simple but provided the formidable bulwark of a constitutional convention as a protection against improvident or hasty (or any other) revision, that they understood that there was a real difference between amendment and revision."
We conclude with the observation that if such proposed amendment were adopted by the people at the General Election and if the Legislature at its next session should fail to submit further amendments to revise and clarify the numerous inconsistencies and conflicts which would result, or if after submission of appropriate amendments the people should refuse to adopt them, simple chaos would prevail in the government of this State. The same result would obtain from an amendment, for instance, of Section 1 of Article V, to provide for only a Supreme Court and Circuit Courts  and there could be other examples too numerous to detail. These examples point unerringly to the answer.
The purpose of the long and arduous work of the hundreds of men and women and many sessions of the Legislature in bringing about the Constitution of 1968 was to eliminate inconsistencies and conflicts and to give the State a workable, accordant, homogenous and up-to-date document. All of this could disappear very quickly if we were to hold that it could be amended in the manner proposed in the initiative petition here.
The judgment appealed from is reversed and this cause is remanded for further proceedings in accordance with the views herein expressed.
It is so ordered.
ROBERTS and ADKINS, JJ., concur.
THORNAL, J., concurs with opinion.
ERVIN, C.J., and BOYD, J., dissent with opinion.
THORNAL, Justice (concurring).
I concur in the opinion and judgment prepared by Justice Drew. I do this because I feel that it announces a very wise and salutary approach to the construction and application of the constitutional provision involved. Moreover, I feel that it evidences a courageous application of a rule of restraint which the people themselves have incorporated in our Constitution to protect it against precipitous and spasmodic changes in the organic law. It would be easy to do as appellee urges us to do by transferring to the electorate the burden of making our decisions on an idealistic pronouncement "to let the people decide". This, however, is not, in my view, the fulfillment of our judicial responsibility. It is often much more difficult for us as judges to take a stand and "do the people's will" when the responsibility is clearly ours under the law. It is the sort of responsibility which frequently we would as soon not have but which, nevertheless, we must assume as judicial officers.
It is perfectly clear to me that by Fla. Const. art. XI, the people of this state have provided several methods for changing the organic law. As Justice Drew points out, "amendment" or "revision" can be accomplished under Section 1. "Revisions" can be accomplished under Section 2 or Section 4, and, "amendment" can be accomplished under Section 3. Instead of doing violence to the "will of the people" as the appellee insists, the position of the majority as announced by Justice Drew is in full measure a fulfilment of the clear wishes of the people of this state.
If, as appellee urges, the provisions of art. XI, § 3, authorize the proposal of *833 amendments to "any sections" instead of any single "section" because of the rules of construction stipulated in Fla. Const. art. X, § 12(b), the result would be the same as announced in the majority opinion. The proposal suggested by Senator Gunter, the appellee, merely suggests the amendment of one section, to wit: Fla. Const. art. III, § 1. In and of itself it is relatively simple and inoffensive. However, the impact of the proposal would be to require, according to my count, the amendment of at least thirty-three (33) other provisions of the Constitution. This certainly is total revision of the entire organic law governing the Legislature  a third of our triune plan of state sovereignty. After all, the 1968 "revision" did not "revise" all of the 1885 Constitution. Article V governing the judiciary and many sections of Article VIII were left intact. Yet everyone agrees that it was a "revision." There is nothing in the proposal to indicate to the people that it has this extraordinary effect. It is for this reason that the provisions of § 3, have obviously been so cautiously drawn in order to avoid accomplishing extremely far-reaching changes in the organic law without notice or warning in the proposal which is being acted upon. For example, in the instant case the proposed change in the structure of the Legislature would completely nullify or radically change the apportionment and re-apportionment sections of the Fla. Const. art. III, § 16. The entire state would have to be re-divided and representation distributed to about one hundred districts. The mathematical structure presently prescribed would go for naught. There is nothing in the proposal to warn the people that in acting on this so-called "brief and simple amendment" they would, in effect, be reviving the arduous and almost awesome task of legislative apportionment that challenged the patience of the Courts, the Legislature and the people of Florida for so many years. Even though the proposal directs the Legislature to present additional implementing amendments in 1972, there is nothing to guarantee that they will do so. As a matter of fact, if experience with re-apportionment should be the precedent, the government of this state would languish in a void for a prolonged indefinite period which might well be consumed by legislative inaction. This is not to be construed as an indictment of the Legislature. It is merely a recognition of a historical fact which adds tremendous weight to the soundness of the Drew opinion. The same could be said of numerous other sections of the present Constitution which would be drastically altered by subterfuge without full warning to the electorate.
It is my earnest and considered judgment that the majority view is unquestionably a fulfilment of the wishes of the people of this state when the Constitution was revised in 1968. After all, that, indeed, is the supreme law.
I, therefore, concur.
ROBERTS, DREW and ADKINS, JJ., concur.
ERVIN, Chief Justice (dissenting).
The majority opinion rejects as constitutionally improper a proposed people's initiative amendment to Section 1 of Article III of the State Constitution that would change the Legislature from a two-house body, consisting of a senate and a house of representatives, to a unicameral legislature, i.e., a senate consisting of not more than one hundred senators.
The majority objects to the proposed initiative amendment on grounds that it would amend more than one section of the Constitution; that it would amount to a revision of the State Constitution, and that if the proposed amendment is approved it would be immediately necessary to amend numerous other provisions of the Constitution. It is categorized by the majority as amounting to a "daisy-chain amendment." It is declared to be a most radical and revolutionary proposal that would "tear apart the whole fabric of the Constitution." It is said that the power "reserved to the *834 people to amend any section of the Constitution, includes only the power to amend any section in such manner that such amendment if approved would be complete within itself, relate to one subject and not substantially affect any other section or article of the Constitution or require further amendments to the Constitution to accomplish its purpose."
I am unable to agree to such restrictive limitations upon the power of the people to initiate amendments to any section of the Constitution.
A cursory reading of Rivera-Cruz v. Gray (Fla. 1958), 104 So.2d 501, will indicate the proposed amendment before us is not a "daisy-chain." It does not purport to revise the constitution or major portion of it but simply undertakes to amend the section creating a two-house legislature by changing it to a unicameral legislature.
When the Legislature amends an existing statute, its amending enactment may have spillover effects that incidentally affect other statutory provisions, but in all the years it has been enacting amendments the Florida Legislature has never been denied the power to amend because its amendment germane to the subject of a particular existing section and complete in itself will have collateral effects on other statutes. An amendment's repugnancy to or inconsistency with other laws may create situations requiring judicial interpretation or subsequent legislation, but the power to make a germane original amendment or change in the law which is complete in itself has never been shackled because such amendment will have side effects on other provisions of law. 50 Am.Jur. Statutes § 214; 30 Fla.Jur. Statutes § 69.
The same rules apply in amending sections of the State Constitution. In Gray v. Golden (Fla.), 89 So.2d 785, this Court said:
"* * * here we are dealing with a proposed amendment for a single purpose and in so doing the legislature may legally propose it so as to limit or modify other provisions than the one proposed to be amended." Text 789.
Compare State ex rel. Elder v. Sours, 31 Colo. 369, 74 P. 167.
Because a proposal may be radical, chaotic or revolutionary in the minds of some is no justification for its rejection ab initio as unconstitutional. After all, a great degree of confidence must necessarily be reposed in the good judgment of the people as has been reserved in them by the initiative provision to weed out the chaotic, the radical, and the revolutionary.
The great danger here to public morale is in denying to the people what plainly was indicated to them in the proposed 1968 Constitution: that they were given the power to initiate substantial germane changes to any section or sections of the Constitution, not merely watered-down minuscule ones which would never substantially affect any other section or article of the Constitution. Such a judicial delimitation upon the power of the people to meaningfully exercise the initiative function ties their hands in making any material changes in the Constitution.
The catalogue in the majority opinion of a long list of provisions of the Constitution that would be collaterally affected to some degree by adopting a unicameral legislature, on close inspection, does not indicate any insuperable disruption would occur in the operation of state government. We have witnessed many profound changes under the 1968 Constitution, but state government has survived, the machinery of government still functions and the people still pay their taxes.
There is little reason to believe a unicameral legislature could not operate in lieu of a two-house legislature and that stopgap legislation could not provide any necessary governmental procedures (even state impeachment procedure, which is rarely resorted to anyway) until any constitutional amendments deemed necessary *835 to conform to a unicameral legislature could be submitted and ratified.
As a court, we can't "play God" for the people and "wet-nurse" them on the supposition that if we don't they will make egregious errors foreign to our political philosophy. Fears that "the people drunk" will overawe "the people sober" are unjustified in the long run.
The great pity produced in the majority opinion is that the people believed in adopting the 1968 Constitution they had the power to initiate major changes in the Constitution; that they had a "club in the closet," so to speak, to use when all other instrumentalities and sources for organic change failed to materialize. With this popular conception of the initiative provision of the 1968 Constitution in mind, it is difficult to believe that Section 1 of Article III of the Constitution, which merely provides a two-house legislature, could not be changed by the people themselves by simple germane amendment complete in itself to a one-house legislature.
Reference to the debates and the votes in the Constitutional Commission and the Legislature on specific provisions of the Constitution for the purpose of throwing light on the meanings intended by the framers may be helpful in doubtful instances. But the plain language of the initiative provision is that the people are given the power to propose amendments to any section of the Constitution. There is no limiting language coupled with this grant of people's power. In this connection, it is well to note that In re Advisory Opinion to the Governor (Fla. 1969), 223 So.2d 35, we said:
"While these discussions [of the Constitutional Revision Commission] were instructive as to background, nevertheless what was submitted to the people for adoption was Sec. 4 Art. IV and not any discussion or debate which may have taken place during the meetings of the Commission."
This dissent could be lengthened considerably by citations from other state supreme courts on the point that the people's will should be deferred to by the courts in their initiative proposals and that restrictions thereon should not be countenanced. However, I will only quote in conclusion from In Re Initiative Petition No. 259, etc., 316 P.2d 139 (Okl. 1957), where the Supreme Court of Oklahoma stated the general rule of construction of initiative provisions which had been established by earlier case law:
"`The people reserve to themselves the power to propose laws and amendments to the Constitution, * * *. This power so reserved to the people should not be crippled, avoided, or denied by technical construction by the courts. It is the duty of the courts to construe and preserve this right as intended by the people in adopting the Constitution and thereby reserve unto the people this power.'"
BOYD, Justice (dissenting).
I must respectfully dissent from the majority opinion.
The initiative section of the 1968 Constitution is a recognition of the inherent power of the people to propose and adopt amendments to the Constitution by petition of the people at large, and without the necessity of relying upon public officials to initiate such amendments. This Court should give liberal construction to this provision in order that the power of the people to amend their government will not be unreasonably limited.
The proponents of the amendment for the unicameral Legislature have recognized that adoption of this amendment would create many problems in government wherein other provisions of the Constitution contemplate a bicameral Legislature. In order to eliminiate difficulties which might so arise, there is contained in the proposed amendment a clause authorizing the Legislature to enact appropriate legislation to *836 adjust the unicameral legislative effort to those aspects of government created in contemplation of a bicameral Legislature. The position of this Court should be that since the people have the capacity to adopt, preserve and defend the Constitution of Florida they have the capacity to make amendments to same at their discretion. It is the duty of the legislative, executive and judicial branches of government to make such adjustments as may be required to comply with the will of the people.
NOTES
[1] The following is the full text of the petition:

"PETITION FOR A ONE HOUSE LEGISLATURE
PETITION PURSUANT TO
ARTICLE XI, SECTION 3: INITIATIVE
TO: Secretary of State
 State of Florida
We, the undersigned, are registered voters in the State of Florida. As such we hereby petition the Secretary of State, for the State of Florida, to place the following amendment to Article III, Section 1 of the Florida Constitution on the ballot in the general election to be held November 7, 1970, in accordance with Article XI, Section 3 of the Constitution of the State of Florida:
ARTICLE III
LEGISLATURE
Section 1. Unicameral Legislature. 
(a) The legislative power of the state shall be vested in a legislature to be known as the senate which shall consist of not more than one hundred senators, the initial members of which shall take office upon election in 1972.
(b) Every bill shall be read on three separate days with a minimum of six days between the second reading of the bill and the third reading of the bill and neither of these requirements may be waived except by unanimous vote of the members present. On the third reading of a bill it shall not be amended except as to title, without the consent of two-thirds of the members voting.
(c) The legislature at its first regular session following the ratification of this amendment shall propose to the electors of the state for ratification or rejection in the general election of 1972 such further amendment of this constitution and shall pass such laws as shall be necessary to implement this amendment.
Signature of Voter Address Congressional District Precinct"

[2] Fla. Const. art. V, § 4(2) (1968), F.S.A.
[3] Fla. Stat. chap. 86 (1969).
[4] 70 So.2d 581 (Fla. 1954).
[5] For a detailed and scholarly discussion of the provisions of prior constitutions relating to amendments see the concurring opinion of Mr. Justice Thornal in Rivera-Cruz v. Gray, 104 So.2d 501 at 506 (Fla. 1958).
[6] Rivera-Cruz v. Gray, 104 So.2d 501 at 505 (Fla. 1958).
[7] Id. at 503.
[8] McFadden v. Jordan, 32 Cal.2d 330, 196 P.2d 787, 796-798 (1948).