Howard BESS, Darlene Bess, Jay Brause, and Gene Dugan, Appellants,

v.

Fran ULMER, Lieutenant Governor of the State of Alaska, and State of Alaska, Appellees.

The Alaska Legislature, acting by and through the Alaska Legislative Council, Representative Pete Kelly, and Senator Loren Leman, Appellants,

v.

Fran Ulmer, in her official capacity as the Lieutenant Governor of the State of Alaska, Appellee.

Elizabeth A. Dodd, Victor "Vic" Fischer, Katherine T. "Katie" Hurley, Ernest E. Line, George Rogers, and Jean Rogers, Appellants,

v.

Fran ULMER, Lieutenant Governor of the State of Alaska, Sandra Stout, Director of Division of Elections, and the State of Alaska, Appellees.

Nos. S–8811/S–8812/S–8821.

Supreme Court of Alaska.

Aug. 17, 1999.

Robert H. Wagstaff, Law Offices of Robert H. Wagstaff, Anchorage, for Appellants Bess, Brause and Dugan.

James L. Baldwin, Assistant Attorney General, Bruce M. Botelho, Attorney General, Juneau, for Appellee State of Alaska.

Kevin G. Clarkson, Brena, Bell & Clarkson, P.C., Anchorage, for Appellee Alaska Legislature.

Allison E. Mendel, Mendel & Associates, Anchorage, for Appellants Dodd, Fischer, Hurley, Line and Rogers.

Jay Alan Sekulow, John P. Tuskey, American Center for Law and Justice, Virginia Beach, Virginia; Kevin Theriot, American Center for Law and Justice–Florida, Panama City, Florida; Robert B. Flint, Hartig, Rhodes, Norman, Mahoney and Edwards, Anchorage, for Amicus Curiae American Center for Law and Justice.

Before: MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

## OPINION

MATTHEWS, Chief Justice.

### I. INTRODUCTION

Citizen groups challenged three ballot propositions to amend the Alaska Constitution because the propositions were revisions not amendments; revisions can only be accomplished through a constitutional convention. In an expedited Preliminary Opinion and Order we held that Legislative Resolve No. 59 (relating to prisoners' right's) is a revision, and struck it from the ballot.[1] Legislative Resolve No. 71 (limiting marriage) and Legislative Resolve No. 74[2] (relating to apportionment) are amendments, and therefore could appear on the ballot, though we disallowed a portion of No. 71. This opinion reaffirms and amplifies our Preliminary Opinion and Order.[3]

---

1. Appellant Bess challenged Legislative Resolve No. 59 in briefs to the superior court and to this court. The State and Legislative defendants did not respond to the argument that the resolve, considered individually, constituted a revision.

2. Appellant Bess challenged Legislative Resolve No. 74 in briefs to the superior court and to this court. The State and Legislative defendants again failed to respond to the challenge.

3. Our Preliminary Opinion and Order is attached as an appendix. It has been edited.

## II. FACTS AND PROCEEDINGS

The superior court granted summary judgment in favor of the State defendants and the Legislative Council, entering final judgment on September 8, 1998. This court granted expedited consideration and heard oral argument on the case on September 18, 1998. On September 22, 1998, we issued a Preliminary Opinion and Order, striking Legislative Resolve No. 59 (restricting the rights of Alaska prisoners to those guaranteed by the federal constitution), allowing in part and deleting in part Legislative Resolve No. 71 (limiting marriage to the union of one man and one woman), and allowing Legislative Resolve No. 74 (transferring the power of reapportionment from the Executive branch to a Redistricting Board).

## III. STANDARD OF REVIEW

[1] The parties agree that there are no material issues of fact before the court. Because the present case involves a question of law, we review the grant of summary judgment de novo and "adopt the rule of law that is most persuasive in light of precedent, reason, and policy." [4]

## IV. DISCUSSION

█ We based our expedited Preliminary Opinion and Order on the fact that the Constitution of the State of Alaska can be changed in only two ways—amendment and revision—and that a separate procedure must be followed for each. To amend the Constitution, the proposed change must be passed by a two-thirds vote of each legislative house and then approved by a majority of the voters.[5] The Constitution may be revised by constitutional convention.[6] By holding that Legislative Resolve No. 59 was a revision, and as such inappropriate as a bal-

lot measure, we adopted the view that the Constitution "can be neither revised nor amended, except in the manner prescribed by itself, and the power which it has conferred upon the legislature in reference to proposed amendments, as well as to calling a convention, must be strictly pursued." [7]

The objective of this opinion is to elucidate the distinction between amendatory changes and revisory changes, to provide some guidance for future endeavors to change the Constitution.

The Framers of the Alaska Constitution distinguished between a revision and an amendment. Like scholars and other framers in other states, they intended this distinction to be substantive. We conclude that a revision is a change which alters the substance and integrity of our Constitution in a manner measured both qualitatively and quantitatively.

### A. Revision and Amendment

The Framers of Alaska's Constitution explicitly contemplated the importance of the differentiation between amendments and revisions and between their respective fields of application.[8] In debating the text of article XIII, section 4, one constitutional convention delegate stated "[t]here is a big difference between revisions, which implies rewriting the constitution, and making amendments to specific articles or sections of the constitution." [9] Although no precise definition of the terms was reached by the Framers (perhaps because such a task is not possible), there was consensus that "amendment" contemplated a simple change, whereas "revision" would encompass broader and more comprehensive changes.[10] The Framers also understood that "[r]evision includes amendment

---

4. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

5. *See* Alaska Const. art. XIII, § 1.

6. *See id.* at § 4. Amendments may also be accomplished by convention. *See id.*

7. *McFadden v. Jordan,* 32 Cal.2d 330, 196 P.2d 787, 789 (1948) (quoting *Livermore v. Waite,* 102 Cal. 113, 36 P. 424, 425 (1894)).

8. *Cf. Adams v. Gunter,* 238 So.2d 824, 831 (Fla. 1970) (quoting *McFadden,* 196 P.2d at 796–98) (noting "differentiation ... between [the] two procedures and between their respective fields of application.").

9. 2 Proceedings of the Alaska Constitutional Convention (PACC) 1247 (January 5, 1956).

10. *See id.* at 1274–77.

but amendment does not include revision."[11] In recognition of these distinctions, the Framers fashioned more stringent procedures for adopting revisions than for adopting amendments.

As first proposed to the convention, article XIII allowed revisions and amendments to be adopted by two successive legislatures.[12] Delegates offered changes during floor debate distinguishing between revisions and amendments. Delegate Cooper proposed a change allowing revisions to be adopted by a two-thirds vote of two successive legislatures, a constitutional convention, or a three-fourths affirmative vote of a single legislature.[13] Under this proposal, amendments were to be adopted by a popular, three-fifths majority vote.[14] As ultimately passed, article XIII retained procedural distinctions for adopting revisions and amendments, but specified constitutional conventions as the only available avenue for revisions.

■ The Framers' decision to narrow the alternatives for adopting revisions by making constitutional conventions the sole permissible procedure demonstrates not only their awareness of the distinction between revisions and amendments, but also their desire to give the distinction substance, thereby ensuring that it would be observed by future generations of Alaskans.

Scholars have also concluded that a distinction exists between the two methods of constitutional change. Judge John A. Jameson, in his *Treatise on Constitutional Conventions,* wrote that the legislative process of amending a constitution should be confined to "changes which are few, simple, independent, and of comparatively small importance," whereas a constitutional convention is required for "a general revision of a Constitution, or even for single propositions involving radical changes as to the policy of which

the popular mind has not been informed by prior discussion."[15]

Judge Jameson's examples of topics properly considered "amendments" include changes designed to address "a doubt ... as to the construction to be put upon a particular clause[,] ... or a new distribution among the agencies of government of their constitutional powers ... to facilitate the transaction of business, or to render public operations more safe or more economical."[16]

■ One purpose of requiring a constitutional convention for revisions of the constitution is to promote stability.

Some political thinkers have interpreted the written constitution in the American political system as a stabilizing element which operates to retard change or requires a more deliberate selection of what changes society deems desirable, hence acceptable. As a document embodying the fundamental political beliefs of the people and an accepted general arrangement of governmental powers, there is indeed good reason to examine searchingly any major changes proposed in the basic structure and philosophy.[17]

Another purpose is to provide a specialized body of citizens whose sole purpose is to consider the constitution as an organic whole, and to make the appropriate and necessary changes.

[C]omplete revisions or even alterations of a very thorough character should be made by conventions expressly chosen for that purpose. Legislatures will usually have their time taken up with other matters and be unable to devote sufficient time to [the] subject, and the election of a body for the one purpose concentrates public attention

---

11. *Id.* at 1275.

12. 6 PACC App. V at 21–22 (December 9, 1955).

13. 2 PACC at 1242.

14. *Id.*

15. Judge John A. Jameson, *A Treatise on Constitutional Conventions; Their History, Powers, and*

*Modes of Proceeding* §§ 540, 574(c) (Chicago, Callaghan and Company, 4th ed. 1887).

16. *Id.* at § 540.

17. Public Administration Service, 3 *Constitutional Studies: Constitutional Amendment and Revision* 1 (November 8, 1955).

upon questions of a constitutional character.[18]

According to Judge Jameson, constitutional changes of a magnitude which can only be accomplished by a revision are not a task for the legislature:

> The legislature is a body chosen for temporary purposes. It is a mirror of political passions and interests, and, with the best intentions, cannot be expected to be free from bias, even in questions of the highest moment. It is composed, moreover, in general, of politicians rather than of statesmen.... But, when a Convention is called, it is sometimes possible to secure the return of such men. It is not necessarily because such a body is recognized to be, as it is, the most important ever assembled in a State, but because the measures it is expected to mature bear less directly on the interests of parties or of individuals. Party management, therefore, is not usually so much directed to the seeking of control of a Convention as of a legislature. Besides, the proper function of the latter body, that of municipal legislation, being one of the highest vested by the sovereign in any governmental agency, it cannot but be inexpedient, on a general view, that there should be added to it that of organic legislation, requiring different and higher gifts, and wider experience and study, thus threatening to unsettle the balance of the Constitution.[19]

The case law of other states which have similar constitutional provisions that distinguish between amendments and revisions is in accord with the scholarly writing. The courts have held that constitutions which provide for both processes of amendment and revision express a distinction of substance.[20] The Supreme Court of Florida described one aspect of the distinction by stating that amendments "originate in the legislature and the people have the choice only of acceptance or rejection of the ones the legislature submits," while in the case of revision "[t]he people's delegates, elected for the purpose, ... weigh proposed provisions, debate their merits, [and] decide what should become and what should not become the organic law." [21] The same court later held that the power to amend the constitution (as distinct from the power to revise it) "includes only the power to amend any section in such a manner that such amendment if approved would be complete within itself, relate to one subject and not substantially affect any other section or article of the Constitution or require further amendments to the Constitution to accomplish its purpose." [22]

### B. *California's Resolution of the Issue*

As the Framers of the Alaska Constitution did not sufficiently define the difference between the two concepts for our purposes, and because Alaska has not before had occasion to address the deceptively simple question of the distinction between revisory and amendatory changes, it is helpful to look to the law of California, a state which has considered the issue carefully over a period of nearly one hundred years. A line of California Supreme Court cases, beginning with *Livermore v. Waite*,[23] has outlined the parameters of the procedures for constitutional change in that state. The *Livermore* court described the importance of adhering to strict procedures for revising and amending the California Constitution.

> Under the first of these methods the entire sovereignty of the people is represented in the convention. The character and extent of a constitution that may be framed by that body is freed from any limitations

---

18. Walter F. Dodd, *The Revision and Amendment of State Constitutions* 261–62 (1910).

19. Jameson, *Constitutional Conventions* at § 539.

20. *See, e.g., Jackman v. Bodine*, 43 N.J. 453, 205 A.2d 713, 725–26 (1964); *Holmes v. Appling*, 237 Or. 546, 392 P.2d 636, 638–39 (1964).

21. *Rivera–Cruz v. Gray*, 104 So.2d 501, 503–04 (Fla.1958). *See also State v. Manley*, 441 So.2d

864, 877 (Ala.1983) (Torbert, C.J., concurring) ("The people of this State, through their Constitution ..., have decreed that they reserve, in revising or replacing the Constitution, a role much more active than merely passing upon a proposal someone else has written.").

22. *Adams v. Gunter*, 238 So.2d 824, 831 (Fla. 1970).

23. 102 Cal. 113, 36 P. 424 (1894).

other than those contained in the constitution of the United States. If, upon its submission to the people, it is adopted, it becomes the measure of authority for all the departments of government,—the organic law of the state,—to which every citizen must yield an acquiescent obedience.... The legislature is not authorized to assume the function of a constitutional convention, and propose for adoption by the people a revision of the entire constitution under the form of an amendment.... The very term "constitution" implies an instrument of a permanent and abiding nature, and the provisions contained therein for its revision indicated the will of the people that the underlying principles upon which it rests, as well as the substantial entirety of the instrument, shall be of a like permanent and abiding nature. On the other hand, the significance of the term "amendment" implies such an addition or change within the lines of the original instrument as will effect an improvement, or better carry out the purpose for which it was framed.[24]

The California Supreme Court relied heavily on Livermore when it decided McFadden v. Jordan[25] more than a half-century later. McFadden concerned a proposed "amendment" to the California Constitution. The amendment was designed to add a new article, composed of two hundred and eight subsections, totalling more than twenty-one thousand words.[26] The court rejected the proposed amendment because it was so "far reaching and multifarious" as to amount to a revision.[27]

The proposal is offered as a single amendment but it obviously is multifarious. It does not give the people an opportunity to express approval or disapproval severally as to each major change suggested; rather does it, apparently, have the purpose of aggregating for the measure the favorable votes from electors of many suasions who, wanting strongly enough any one or more propositions offered, might grasp at that which they want, tacitly accepting the remainder. Minorities favoring each proposition severally might, thus aggregated, adopt all. Such an appeal might well be proper in voting on a revised constitution, proposed under the safeguards provided for such a procedure, but it goes beyond the legitimate scope of a single amendatory article. There is in the measure itself no attempt to enumerate the various and many articles and sections of our present Constitution which would be affected, altered, replaced or repealed.[28]

Four cases on the same topic followed McFadden.[29] In three of those cases the California Supreme Court decided that challenged proposals to amend the state constitution were not impermissible revisions.[30] Amador Valley v. State[31] concerned Proposition 13, which proposed a new article, dramatically changing California's system of property taxation.[32] After discussing Livermore and McFadden, the court went on to state that the method for distinguishing between amendments and revisions "must be both quantitative and qualitative in nature."[33]

For example, an enactment which is so extensive in its provisions as to change

24. Id. at 426.

25. 32 Cal.2d 330, 196 P.2d 787 (1948).

26. Id. at 790.

27. Id. at 788.

28. Id. at 796–97.

29. These cases are: Legislature of the State of California v. Eu, 54 Cal.3d 492, 286 Cal.Rptr. 283, 816 P.2d 1309 (1991); Raven v. Deukmejian, 52 Cal.3d 336, 276 Cal.Rptr. 326, 801 P.2d 1077 (1990); Brosnahan v. Brown, 32 Cal.3d 236, 186 Cal.Rptr. 30, 651 P.2d 274 (1982); Amador Val-

ley Joint Union High School Dist. v. State Board of Equalization, 22 Cal.3d 208, 149 Cal.Rptr. 239, 583 P.2d 1281 (1978).

30. See Eu, 286 Cal.Rptr. 283, 816 P.2d at 1318; Brosnahan, 186 Cal.Rptr. 30, 651 P.2d at 288–89; Amador Valley, 149 Cal.Rptr. 239, 583 P.2d at 1284–89.

31. 22 Cal.3d 208, 149 Cal.Rptr. 239, 583 P.2d 1281 (1978).

32. Id. 149 Cal.Rptr. 239, 583 P.2d at 1283.

33. Id. 149 Cal.Rptr. 239, 583 P.2d at 1286.

directly the "substantial entirety" of the Constitution by the deletion or alteration of numerous existing provisions may well constitute a revision thereof. However, even a relatively simple enactment may accomplish such far reaching changes in the nature of our basic governmental plan as to amount to a revision also. In illustration, ... an enactment which purported to vest all judicial power in the Legislature would amount to a revision without regard either to the length or complexity of the measure or the number of existing articles or sections affected by such change.[34]

The court held that Proposition 13 was neither quantitatively nor qualitatively revisory in nature, despite the fact that it accomplished "substantial changes" in the tax system.[35]

In *Brosnahan v. Brown*,[36] the California Supreme Court applied this quantitative/qualitative analysis in holding that the proposition known as the "Victims' Bill of Rights" was not an illegitimate revision.[37] The court concluded that the "substantial changes" the proposal would accomplish failed to amount to a sufficiently "far reaching change[ ] in the nature of [the] basic governmental plan as to amount to a revision." [38]

Finally, in *Legislature of the State of California v. Eu*,[39] the California Supreme Court addressed a proposed amendment designed to limit "the powers of incumbency" by providing for term limits and restrictions on legislators' retirement benefits.[40] Although the court recognized that "[t]erm and bud-

getary limitations may affect and alter the particular legislators and staff who participate in the legislative process," it held that "the basic and fundamental structure of the Legislature as a representative branch of government is left substantially unchanged" and therefore the proposal was not a qualitative revision of the constitution.[41]

Less than a year before *Eu* was decided, the California Supreme Court had applied the quantitative/qualitative analysis to a challenged initiative measure and reached a different result in *Raven v. Deukmejian*.[42] At issue there was a proposal entitled the "Crime Victims Justice Reform Act," designed to limit the rights of criminal defendants to those guaranteed by the federal constitution.[43] To that end, the measure contained a section that provided that certain criminal law rights "shall be construed by the courts of [California] in a manner consistent with the Constitution of the United States" and that the state constitution "shall not be construed to afford greater rights" than those afforded by the federal constitution.[44] The *Eu* court later noted that the proposal in *Raven* (in contrast to that in *Eu*) was one that "would have fundamentally changed and subordinated the constitutional role assumed by the judiciary in the governmental process." [45] In other words, the amendment would affect a core function of one of the three branches of government, an outcome expressly forbidden by *Amador Valley*.[46]

The California Supreme Court based its holding in *Raven* solely on the qualitative effect of the proposed amendment:

34. *Id.*

35. *Id.* 149 Cal.Rptr. 239, 583 P.2d at 1286–87, 1289.

36. 32 Cal.3d 236, 186 Cal.Rptr. 30, 651 P.2d 274 (1982).

37. *Id.* 186 Cal.Rptr. 30, 651 P.2d at 276, 288–89.

38. *Id.* 186 Cal.Rptr. 30, 651 P.2d at 288–89 (quoting *Amador Valley*, 149 Cal.Rptr. 239, 583 P.2d at 1286).

39. 54 Cal.3d 492, 286 Cal.Rptr. 283, 816 P.2d 1309 (1991).

40. *Id.* 286 Cal.Rptr. 283, 816 P.2d at 1312.

41. *Id.* 286 Cal.Rptr. 283, 816 P.2d at 1318.

42. 52 Cal.3d 336, 276 Cal.Rptr. 326, 801 P.2d 1077 (1990).

43. *Id.* 276 Cal.Rptr. 326, 801 P.2d at 1079, 1080–83.

44. *Id.* 276 Cal.Rptr. 326, 801 P.2d at 1086.

45. *Eu*, 286 Cal.Rptr. 283, 816 P.2d at 1318.

46. 149 Cal.Rptr. 239, 583 P.2d at 1286 ("[A]n enactment which purported to vest all judicial power in the Legislature would amount to a revision without regard either to the length or complexity of the measure or the number of existing articles or sections affected by such change.").

As a practical matter, ultimate protection of criminal defendants from deprivation of their constitutional rights would be left in the care of the United States Supreme Court. Moreover, the nature and extent of state constitutional guarantees would remain uncertain and undeveloped unless and until the high court had spoken and clarified *federal* constitutional law.

In effect, [the proposed amendment] would substantially alter the substance and integrity of the state Constitution as a document of independent force and effect.[47]

The court specifically stated that the proposed amendment did not have a quantitatively revisory effect, as it "delete[d] no existing constitutional language and it affect[ed] only one constitutional article,"[48] but concluded that qualitatively it was "so far reaching as to amount to a constitutional revision beyond the scope of the initiative process."[49]

C. *The Alaska Rule and Its Application to the Three Challenged Ballot Measures*

 The Constitution of Alaska, like that of California, provides different procedures for different methods of constitutional change.[50] In deciding whether the proposal is an amendment or revision, we must consider both the quantity and quality of the proposed constitutional changes. We agree with the reasoning of the California Supreme Court in *Livermore*, *McFadden*, and *Amador Valley* that

an enactment which is so extensive in its provisions as to change directly the "substantial entirety" of the constitution by the deletion or alteration of numerous existing provisions may well constitute a revision thereof [while] even a relatively simple enactment may accomplish such far reach-

ing changes in the nature of our basic governmental plan as to amount to a revision also.[51]

 The process of amendment, on the other hand, is proper for those changes which are "few, simple, independent, and of comparatively small importance."[52] The core determination is always the same: whether the changes are so significant as to create a need to consider the constitution as an organic whole. With this in mind, we turn to an evaluation of each of the three challenged ballot measures.

1. *Legislative Resolve No. 59*

 This measure proposed to amend the Alaska Constitution by adding a new section to article I, providing as follows:

Rights of Prisoners. Notwithstanding any other provision of this constitution, the rights and protections, and the extent of those rights and protections, afforded by this constitution to prisoners convicted of crimes shall be limited to those rights and protections, and the extent of those rights and protections, afforded under the Constitution of the United States to prisoners convicted of crimes.

This proposal bears an obvious similarity to the initiative measure at issue in *Raven*.[53] Like the *Raven* court, we find the proposal to "amount to a constitutional revision beyond the scope of the [ballot] process,"[54] although our reasoning differs somewhat. The *Raven* court held that the proposal constituted a qualitatively revisory change to the constitution, but not a quantitatively revisory change.[55] We take a hybrid approach. Not only would the proposal, for the reasons stated in *Raven*, "substantially alter the substance and integrity of the state Constitution as a document of independent force and ef-

---

**47.** *Raven*, 276 Cal.Rptr. 326, 801 P.2d at 1087 (emphasis in original).

**48.** *Id.* 276 Cal.Rptr. 326, 801 P.2d at 1086–87 (emphasis omitted).

**49.** *Id.* 276 Cal.Rptr. 326, 801 P.2d at 1086.

**50.** *See* discussion at page 982, *supra*.

**51.** *Amador Valley*, 149 Cal.Rptr. 239, 583 P.2d at 1286.

**52.** Jameson, *Constitutional Conventions* at § 540.

**53.** 276 Cal.Rptr. 326, 801 P.2d at 1086.

**54.** *Id.*

**55.** *Id.* 276 Cal.Rptr. 326, 801 P.2d at 1086–90.

fect," [56] but as we held in the Preliminary Opinion and Order, it also would potentially alter as many as eleven separate sections of our Constitution. Both qualitatively and quantitatively, therefore, Legislative Resolve No. 59 is an impermissible constitutional revision.

### 2. Legislative Resolve No. 71

■ This measure proposed to amend the Alaska Constitution by adding a new section to article I providing as follows:

> Marriage. To be valid or recognized in this State, a marriage may exist only between one man and one woman. No provision of this constitution may be interpreted to require the State to recognize or permit marriage between individuals of the same sex.

Under our hybrid analysis, this proposed ballot measure is sufficiently limited in both quantity and effect of change as to be a proper subject for a constitutional amendment.[57] Few sections of the Constitution are directly affected, and nothing in the proposal will "necessarily or inevitably alter the basic governmental framework" of the Constitution.[58]

### 3. Legislative Resolve No. 74

■ This ballot measure was designed to alter the reapportionment scheme of article VI of the Alaska Constitution, concerning House and Senate districts. The Framers of the Alaska Constitution gave the power to reapportion the legislative districts to the executive branch, to be used as a check against legislative power.[59] Legislative Resolve No. 74 removes this power from the executive and assigns it to a neutral body.[60] Reassigning this power is unquestionably a significant change in the present system of Alaskan government. It does not, however, deprive the executive branch of a "foundational power," and as a result does not constitute a revision.[61] As the quantitative effect of the proposal is minimal, the qualitative force of this narrow change would have to be greater to satisfy our hybrid test. The essential function of the executive branch—to enforce the laws of the state—remains unchanged, as does its structure. No executive power is delegated to either of the other two branches. In fact, the intent of the Framers in giving the reapportionment power to the executive was primarily to prevent the abuse or neglect of that power in the hands of the legislature, rather than to safeguard a uniquely executive function.[62] Historically,

**56.** *Id.* 276 Cal.Rptr. 326, 801 P.2d at 1087.

**57.** Our Preliminary Opinion and Order deleted the second sentence of Legislative Resolve No. 71 on other grounds. Appellants expressed concern that the language could be interpreted to permit the prosecution of individuals involved in marriage-like relationships without the benefit of state sanction, and that this risk might discourage religiously sanctioned marriage ceremonies. Appellees questioned the need for deletion, contending that the language was mere surplusage, but conceded at oral argument that this court has the power to order deletion. We explained our decision to order deletion as follows:

> We do not believe that language which is surplusage should be part of the constitution. Of special concern is the possibility that the sentence in question might be construed at some future time in an unintended fashion which could seriously interfere with important rights. As decades pass, the legislative history of the resolve may fade from memory. Further, court decisions lack the permanence of constitutional language and may be overruled. The objective of the second sentence—harmonization of other provisions of the constitution with the meaning of the first sentence—will be achieved in any event, for a specific amend-

ment controls other more general provisions with which it might conflict. [*See*] *Johns v. Commercial Fisheries Entry Comm'n,* 758 P.2d 1256, 1264 (Alaska 1988); *State v. Ostrosky,* 667 P.2d 1184, 1190 (Alaska 1983).

**58.** *Brosnahan,* 186 Cal.Rptr. 30, 651 P.2d at 289.

**59.** *See* 3 PACC 1839 (January 11, 1956)("[S]tudents and writers seem generally in accord that reapportionment ... has been neglected where it has been left to legislators.").

**60.** The power to draw the boundaries of the House and Senate districts thereby passes from the governor, with the advice of a reapportionment board of his own appointment, to a five-member Redistricting Board, two members of which are appointed by the governor and one each by the House Speaker, the Senate President, and the Chief Justice of the Supreme Court.

**61.** *Eu,* 286 Cal.Rptr. 283, 816 P.2d at 1318.

**62.** Though the Framers assigned the reapportionment power to the executive branch, there are statements in the Proceedings of the Constitutional Convention that indicate that assigning

the "method [of delegating reapportionment power to the legislature itself] was a total failure" so the Framers delegated it to the executive "in order to assure that the reapportionment will be made and that there will not be neglect." [63]

This proposal, unlike Legislative Resolve No. 59, does not "fundamentally change[ ] and subordinate[ ] the constitutional role" of any branch in the governmental process.[64] Therefore, although the proposed change is substantial, it is not so "far reaching and multifarious" as to comprise a revision.[65]

## V. CONCLUSION

We REAFFIRM the Preliminary Opinion and Order.

COMPTON, Justice, dissenting in part.

I have reexamined the Preliminary Opinion and Order, my partial dissent from that order, and the court's present amplification of its preliminary opinion. Nothing presented in the amplification has persuaded me now to take a different path.

First, I think it unclear just what test the court is adopting. The court cites and quotes with approval California cases that have shaped that state's development of the constitutional distinction between revisions of and amendments to its constitution. California's analysis does not focus on only one test, but rather on two: does the proposed enactment quantitatively *or* qualitatively revise the constitution? If a proposed enactment changes the substantial entirety of the constitution because of numerous deletions and alterations, quantitatively it may constitute a revision. On the other hand, if a proposed enactment accomplishes a far reaching change in the nature of government, qualitatively it likewise may constitute a revision even though the enactment is simple. California's analysis does not entirely preclude some degree of subjectivity in its application, but realistically it could not. The California approach seems well suited to its purpose.

This court states that it "agree[s] with the reasoning of the California Supreme Court." [1] Yet in regard to Legislative Resolve No. 59, it states that "[w]e take a hybrid approach." [2] It concludes that Legislative Resolve No. 59 fails both the quantitative and qualitative tests.[3] Applying California's analysis, the proposal is a revision. While it may be correct to say that Legislative Resolve No. 59 fails both tests, I do not understand why this makes the test "hybrid."

The court again refers to its "hybrid analysis" in its discussion of Legislative Resolve No. 71.[4] It concludes that this proposal "is sufficiently limited in both quantity and effect of change as to be a proper subject for constitutional amendment." [5] This proposal offends neither of California's tests, and would not be a revision in that state. Again I fail to understand what is hybrid about the analysis applied by this court.

The court uses the term "hybrid" again with respect to Legislative Resolve No. 74.[6] It concludes that although reassignment of the power to reapportion the legislature is "significant," it does not constitute a revision since it does not deprive the executive branch of a "foundational power." [7] The court reasons: "As the quantitative effect of the proposal is minimal, the qualitative force of this narrow change would have to be greater to satisfy our hybrid test." [8] The court still has not articulated just what its "hybrid test" is,

---

the power to an independent board would be a rational, relatively uncontroversial alternative. *See* 3 PACC at 1859, 1863.

**63.** 3 PACC 1858 (January 11, 1956).

**64.** *Eu*, 286 Cal.Rptr. 283, 816 P.2d at 1318.

**65.** *Cf. Brosnahan*, 186 Cal.Rptr. 30, 651 P.2d at 288–89; *Amador Valley*, 149 Cal.Rptr. 239, 583 P.2d at 1284–89.

**1.** Op. at 987.

**2.** Op. at 987.

**3.** *Id.*

**4.** *Id.*

**5.** *Id.*

**6.** Op. at 988.

**7.** *Id.*

**8.** *Id.*

although it sounds suspiciously like a sliding comparative scale test of some sort.

The California analysis, with which this court has stated it agrees, does not test by comparing quantitative and qualitative criteria; each stands on its own merits. A proposed enactment could satisfy neither test, either test, or both tests. That does not make the test a "hybrid," nor does it suggest some sort of sliding comparative scale. This court's failure to carefully articulate the test it is adopting is unfortunate.

This court's analysis is not constrained by contrary findings or analysis by the superior court. Although the superior court was asked to adopt California's *Raven v. Deukmejian* [9] analysis, it declined to do so. It concluded that looking to "the historical context of constitutional amendments in Alaska" was the correct analytical approach. The superior court concluded that "a lot of these amendments add[ ] to rights rather than detract[ ] from them, ... then on the flip side the same constitutional amendment could detract from [them]." A revision would not be necessary; an amendment would suffice. Thus the record and briefing are virtually barren of any presentation of the quantitative or qualitative impact of Legislative Resolve No. 74. Nonetheless, this court declares the quantitative effect to be "minimal" and the qualitative effect "narrow." [10]

It is valuable to compare Legislative Resolve No. 74 with Legislative Resolve No. 59 and Legislative Resolve No. 71. Legislative Resolve No. 59 amends article I of the Alaska Constitution by adding section 25, which, in sixty-five words or less, limits the rights of prisoners. This court has identified eleven constitutional provisions that will be actually or potentially affected by Legislative Resolve No. 59.[11] It concludes that this proposed enactment is not a permissible constitutional

amendment, foundering on both quantitative and qualitative grounds.[12] Since I agree that the proposal founders on quantitative grounds, I need not address the remainder of the conclusion. Suffice it to say, however, that its application appears relatively simple.

Legislative Resolve No. 71 amends article I of the Alaska Constitution by adding section 26, which, in forty-five words or less, defines marriage. This court concludes that this proposed enactment is a permissible constitutional amendment, not a revision, since it is limited "in both quantity and effect of change." [13] Again, I agree.

Legislative Resolve No. 74 is altogether another matter. It explicitly amends article VI of the Alaska Constitution by revising sections 1, 2, 3, 4, 6, 8, 9, 10, and 11, and by repealing sections 5 and 7; article XI by revising section 3; article XIV by repealing it; and article XV by adding section 29. It *implicitly amends article VI of the Alaska Constitution by adding to the powers of the Chief Justice of the Alaska Supreme Court. As noted, this is brushed aside by the court as quantitatively "minimal." [14] While some of the amendments are procedural in nature, others alter the core of the reapportionment/redistricting process as it has been known in Alaska since statehood.*

This court cites carefully selected language from *Legislature of the State of California v. Eu,*[15] to support its assertion that the executive branch must be deprived of a "foundational power" before a proposed enactment constitutes a revision rather than an amendment.[16] That is not what *Eu* says:

By contrast, Proposition 140 on its face does not affect either the structure or the foundational powers of the Legislature, which remains free to enact whatever laws it deems appropriate. The challenged measure alters neither the content of those laws nor the process by which they are

---

**9.** *52 Cal.3d 336, 276 Cal.Rptr. 326, 801 P.2d 1077 (1990).*

**10.** Op. at 987.

**11.** Op. Appendix at 995.

**12.** Op. at 987.

**13.** *Id.*

**14.** Op. at 987.

**15.** *54 Cal.3d 492, 286 Cal.Rptr. 283, 816 P.2d 1309 (1991).*

**16.** Op. at 987–988.

adopted. No legislative power is diminished or delegated to other persons or agencies. The relationships between the three governmental branches, and their respective powers, remain untouched.[17]

Citing *Raven*, *Eu* observes that "a qualitative revision includes one that involves a change in the basic plan of California government, i.e., a change in its fundamental structure or the foundational powers of its branches."[18] Later, *Eu* again observes that "[o]ur prior decisions have made it clear that to find such a revision, it must *necessarily or inevitably appear from the face* of the challenged provision that the measure will substantially alter the basic governmental framework set forth in our Constitution."[19]

Neither *Eu* nor any other California case requires that the branch of government to be affected by a proposed enactment be deprived of a foundational power before the proposal constitutes a revision rather than an amendment. Rather, *Eu*'s language is much less demanding. Its qualifiers are *"affect," "alter," "change," "diminish[ ]," and "delegate[ ]."*[20] In *Eu*, the California Supreme Court concluded that "[t]he relationships between the three governmental branches, and their respective powers, remain *untouched.*"[21]

This court acknowledges that "[t]he Framers of the Alaska Constitution gave the power to reapportion the legislative districts to the executive branch, to be used as a check against legislative power," citing a statement in the Proceedings of the Alaska Constitutional Convention that "[S]tudents and writers seem generally in accord that reapportionment . . . has been neglected where it has been left to legislators."[22] The court advances no reason why the executive branch should now be deprived of this check on legislative power, so debated in the Constitutional Convention, and so unique in American government. Nor does the court take issue with the statement I made in my dissent to the Preliminary Opinion and Order that

[t]he chief executive's constitutional powers, including the power over reapportionment, were among the most debated, if not the most debated, issues at Alaska's Constitutional Convention. . . . [N]ot only will the "amendment" divest the chief executive of much of the constitutional power that office has held since statehood, and invest the legislature with a constitutional power heretofore unknown to it, but also it will bring the judiciary into the reapportionment process in a manner which is potentially highly political.[23]

This court recognized the uniqueness of Alaska's constitutional reapportionment scheme over thirty years ago in *Wade v. Nolan:*[24]

Before attempting to discuss [whether the acts of the Governor and his advisory Reapportionment Board in reapportioning the Senate were authorized by the Alaska Constitution] it is well to explain the origin of a unique feature of the reapportionment provisions of the Alaska Constitution. Whereas, traditionally, reapportionment had been made the responsibility of state legislatures, the Alaska Constitutional Convention purposely avoided placing any authority or responsibility for reapportionment in the legislature. The Convention was aware of the notorious and frequent failure or downright refusal of state legislatures to comply with their constitutional or statutory duty to reapportion. The Alaska Convention's reason for placing reapportionment responsibility in the Governor was well stated by its Chairman of the Committee on Suffrage, Elections and Apportionment, John S. Hellenthal. . . .

. . . .

17. *Eu*, 286 Cal.Rptr. 283, 816 P.2d at 1318.

18. *Id.* (citing *Raven*, 52 Cal.3d 336, 276 Cal.Rptr. 326, 801 P.2d 1077).

19. *Id.* 286 Cal.Rptr. 283, 816 P.2d at 1319 (citations omitted).

20. *Id.* 286 Cal.Rptr. 283, 816 P.2d at 1318–19 (emphasis added).

21. *Id.* 286 Cal.Rptr. 283, 816 P.2d at 1318 (emphasis added).

22. Op. at 988 and note 59.

23. Op. Appendix at 997.

24. 414 P.2d 689 (Alaska 1966).

A reading of the Convention minutes in relation to the reapportionment provisions makes it abundantly clear that it was the specific intent of the Convention to grant no authority to and to place no responsibility in the legislature with respect to reapportionment. In a clear and clean-cut departure from tradition, all of the authority and responsibility for reapportionment granted or assigned was placed in the Governor, assisted by a Reapportionment Board, including the authority to make minor changes in Senate Districts.[25]

The court quotes Hellenthal at length, including his reference to other variations of a plan.[26] Hellenthal concludes with the statement that "the best thought seemed to indicate that the people would be best helped if [reapportionment] were an executive function.... But it is the inaction of the legislature, as testified to by the universal history of the 48 states, that we're trying to overcome." [27] There is virtually no textual support for this court's assertion that some Framers believed "assigning the power to an independent board would be a rational, relatively uncontroversial alternative." [28]

In my dissent from the court's Preliminary Opinion and Order, I remarked that

[t]he proposed constitutional "revision" regarding prisoners affects a narrow class of persons comparatively few in number. Yet because it implicates numerous state constitutional provisions, and divests prisoners of state constitutional protections, we conclude that it is a constitutional "revision" that cannot be brought before the voters as a constitutional "amendment" initiated by legislative action.[1] On the other hand, we conclude that the proposed change regarding reapportionment, which fundamentally redistributes among all three branches of government constitutional power previously held by the chief executive alone, impacts all voters within the state, and restructures the manner by which the voters are grouped together to

elect their legislators, is a mere constitutional "amendment" undeserving of the politically impartial deliberation inherent in the constitutional convention process. The irony is remarkable.[29]

---

1 In concluding that Legislative Resolve No. 74 is an "amendment" and not a "revision," the court observes that "[w]hile the change is an important one, it is simple to express and understand. It is complete within itself, relates to only one subject, and does not substantially affect numerous sections of the constitution." Except for the "does not substantially affect" phrase, which relates to the numerous constitutional provisions that will be affected, what could be more easily expressed and understood than that the rights of prisoners under the Alaska Constitution shall be limited to those afforded by the Constitution of the United States?

Juxtaposing these two proposed enactments today produces no less irony than it did eleven months ago when the Preliminary Opinion and Order were entered. The landscape so carefully crafted by the Alaska Constitutional Convention's Committee on Suffrage, Elections and Apportionment has been fundamentally and dramatically "affected," "altered," and "changed." The executive branch's power has been "diminished" by being "delegated" to a board of significantly different composition than that which heretofore was constituted. Legislative Resolve No. 74 does not leave the relationships between the three respective branches of government, and their respective powers, "untouched." The contrary is plainly evident. Legislative Resolve No. 74 is just as plainly a constitutional revision. The substance of Legislative Resolve No. 74 should have to undergo the deliberative scrutiny to which the issue was subjected in anticipation of statehood. To proclaim that this is a "narrow" enactment, as does this court, is to reduce reapportionment to the trivial. Years of reapportionment litigation, and hundreds of pages of Alaska Supreme Court orders and opinions, demonstrate just how important the issue is, and how wrong this court is to hold otherwise.

25. *Id.* at 694–95.

26. *Id.*

27. 3 Proceedings of the Alaska Constitutional Convention (PACC) 1859 (January 11, 1956).

28. Op. at 988, note 62.

29. Op. Appendix at 997.

APPENDIX

*DISCUSSION*

1. Challenged in this case are three ballot propositions to amend the Alaska Constitution which by legislative resolve are to be placed before the voters in the November 1998 general election. The superior court granted summary judgment in favor of the State defendants and the Legislative Council and entered final judgment on September 8, 1998. Because of the immediate need to decide what the general election ballot shall contain we granted expedited consideration. For the reasons set forth below we conclude that (1) Legislative Resolve No. 59 (relating to prisoners' rights) may not appear on the ballot, (2) Legislative Resolve No. 71 (limiting marriage) may appear on the ballot, but the second sentence of the proposed amendment should be deleted, and (3) Legislative Resolve No. 74 (relating to reapportionment) may appear on the ballot.

2. The Alaska Constitution recognizes two types of constitutional change. The constitution may be *amended* or it may be *revised.*

a. *Amendment.* There are two methods of amendment. The method relevant here is by legislative proposition which is passed by two-thirds of the members of each legislative house and adopted by a majority of the voters. Alaska Const. art. XIII, § 1. A constitutional convention may also propose amendments. These become effective if they are ratified by the voters. Alaska Const. art. XIII, § 4.

b. *Revision.* There is one method of revision. The constitution may be revised only by a constitutional convention ratified by the voters. Alaska Const. art. XIII, § 4.

3. All three ballot propositions are challenged on the ground that they are inappropriate as amendments under article XIII, section 1 of the Alaska Constitution. Appellants argue that the changes the propositions seek to accomplish can only be effected, if at all, by the constitutional process of revision.

4. Case law is evidently unanimous in support of the view that there is a distinction of substance between the concepts of amendment and revision and that some proposed constitutional changes can only be accomplished by revision. *McFadden v. Jordan,* [32 Cal.2d 330] 196 P.2d 787 (Cal.1948); *Rivera–Cruz v. Gray,* 104 So.2d 501 (Fla.1958). The proceedings of the Alaska Constitutional Convention indicate that the framers of our constitution were in accord with this view. 2 Proceedings of the Alaska Constitutional Convention 1247, 1251, 1275 (January 5, 1956).

5. The line between changes which are permissible as amendments and those which must necessarily be revisions cannot be drawn with precision. In general, changes which are "few and simple and independent" can be considered amendments, whereas "sweeping change" requires the revision process. *See State v. Manley,* 441 So.2d 864, 879 (Ala.1983) (Torbert, C.J., concurring); *Jackman v. Bodine* [43 N.J. 453] 205 A.2d 713, 725 (N.J.1964), both quoting sections from Judge John A. Jameson, *A Treatise on Constitutional Conventions* (4th ed. 1887). *McFadden* is instructive on the distinction between amendment and revision. We quote it at some length because it was decided by a distinguished court only a few years before the Alaska Constitution was written. Quoting from an earlier case, the *McFadden* court discussed revisions made by a convention in which "the entire sovereignty of the people is represented...." *McFadden,* 196 P.2d at 789.

> The character and extent of a constitution that may be framed by that body is freed from any limitations other than those contained in the constitution of the United States.... The very term ["]constitution" implies an instrument of a permanent and abiding nature, and the provisions contained therein for its revision indicated the will of the people that the underlying principles upon which it rests, as well as the substantial entirety of the instrument, shall be of a like permanent and abiding nature. On the other hand, the significance of the term "amendment" implies such an addition or change within the lines of the original instrument as will effect an improvement, or better carry out the purpose for which it was framed.

*Id.* (quoting *Livermore v. Waite,* [102 Cal. 113] 36 P. 424, 425 (Cal.1894)). The court held that the measure in question was so "far reaching and multifarious" that it was revisory rather than amendatory in nature. *Id.* at 788. The court listed numerous sections of the constitution which the measure in question would affect. *Id.* at 794–96. This review demonstrated

> the wide and diverse range of subject matters proposed to be voted upon, and the revisional effect which it would necessarily have on our basic plan of government. The proposal is offered as a single amendment but it obviously is multifarious. It does not give the people an opportunity to express approval or disapproval severally as to each major change suggested. . . .

*Id.* at 796–97. In *Adams v. Gunter,* 238 So.2d 824 (Fla.1970), the court opined that amendment as distinct from revision authority "includes only the power to amend any section in such a manner that such amendment if approved would be complete within itself, relate to one subject and not substantially affect any other section or article of the Constitution or require further amendments to the Constitution to accomplish its purpose." *Id.* at 831.

■ 6. The above authorities are quoted merely to suggest factors that should be considered in determining whether a proposed constitutional change is amendatory or revisory. In making such a determination, respect for the legislature and the electoral process requires that courts should decline to order a measure removed from the ballot except in clear cases. *See Meiners v. Bering Strait Sch. Dist.,* 687 P.2d 287, 296 (Alaska 1984).

7. *Legislative Resolve No. 59.* This measure proposes to amend the Alaska Constitution by adding a new section to article I providing as follows:

> Rights of Prisoners. Notwithstanding any other provision of this constitution, the rights and protections, and the extent of those rights and protections, afforded by this constitution to prisoners convicted of crimes shall be limited to those rights and

protections, and the extent of those rights and protections, afforded under the Constitution of the United States to prisoners convicted of crimes.

1998 Legislative Resolve No. 59 (HCS CSSJR 3). All provisions of the Alaska Constitution granting prisoners' rights not granted under the federal constitution are superseded or amended by this measure. Numerous provisions of the Alaska Constitution are either actually or potentially affected. Changed or potentially changed would be such constitutional guarantees as the right of all persons to equal rights, art. I, § 1; freedom of religion, art. I, § 4; freedom of speech, art. I, § 5; the right to petition government, art. I, § 6; the right to due process of law, art. I, § 7; protections from double jeopardy and self-incrimination, art. I, § 9; the right to counsel, art. I, § 11; protection from excessive bail, excessive fines and cruel and unusual punishment, art. I, § 12; the rights which flow from the principle of reformation, art. I, § 12; the privilege of habeas corpus, art. I, § 13; protection from unreasonable searches and seizures, art. I, § 14; and the right to privacy, art. I, § 22.

8. Legislative Resolve No. 59 is similar in character to the ballot measure involved in *Raven v. Deukmejian,* [52 Cal.3d 336, 276 Cal.Rptr. 326] 801 P.2d 1077 (Cal.1990). The measure in that case provided in part that the California Constitution "shall not be construed by the courts to afford greater rights to criminal defendants than those afforded by the Constitution of the United States . . . ." *Id.* [276 Cal.Rptr. 326, 801 P.2d] at 1086. The California Supreme Court concluded that this measure "would be so far reaching as to amount to a constitutional revision . . . ." *Id.* We reach the same conclusion in this case. Legislative Resolve No. 59 would eliminate the independent force and effect of so many provisions of the Alaska Constitution with respect to the rights of prisoners that it is beyond the limits of the amendatory process of article XIII, section 1.

9. *Legislative Resolve No. 71.* This measure would amend article I of the Alaska Constitution by adding a new section to read:

Marriage. To be valid or recognized in this State, a marriage may exist only between one man and one woman. No provision of this constitution may be interpreted to require the State to recognize or permit marriage between individuals of the same sex.

1998 Legislative Resolve No. 71 (HCS CSSJR 42). The appellees contend that the meaning of this measure is that only marriages between one man and one woman may be given official status and recognition. Appellants contend that it has broader implications. They argue that the first sentence necessarily amends the Alaska Constitution in three respects: changing the equal rights clause, art. I, § 1; the civil rights clause, art. I, § 3; and the privacy section, art. I, § 22. They contend that the second sentence divests the judiciary of the power to interpret the constitution. Further, they argue that the second sentence "permits the criminalization of homosexual relationships ..." and may modify the free exercise of religion clause of article I, section 4 "because some religions ... perform same sex marriages today."

10. In our view the first sentence of the resolve is not so broad in scope that it is impermissible as an amendment. It potentially affects the meaning of the equal rights clause contained in article I, section 1. Article I, section 3 is not affected, for it does not specify sexual preference as a suspect classification. Further, it is unclear whether the right to privacy is affected, for the first sentence is concerned with recognition of marriage as an official relationship, not with private relationships. Moreover, the content of the sentence is simple to express and understand. It relates to only one subject and does not substantially affect numerous other sections of the constitution.

11. More problematical are two aspects of the second sentence of the measure. The appellants argue that the second sentence may be interpreted to permit the prosecution of individuals because they are involved in marriage-like relationships which are not officially sanctioned, and may tend to inhibit, because of this risk, religiously sanc-tioned marriage ceremonies. The appellees counter that the second sentence is superfluous. They argue that it is intended to say no more than that other provisions of the Alaska Constitution must be harmonized with the first sentence. Appellees suggest that this court could make it clear that the proposed amendment is not intended to interfere with or criminalize private or religiously recognized same-sex partnerships by issuing an interpretation to that effect in this case. At oral argument the appellees acknowledged that this court has the power to order the deletion of the second sentence, but questioned the need for this action since the sentence is merely surplusage. We believe that there is such a need. We do not believe that language which is surplusage should be part of the constitution. Of special concern is the possibility that the sentence in question might be construed at some future time in an unintended fashion which could seriously interfere with important rights. As decades pass, the legislative history of the resolve may fade from memory. Further, court decisions lack the permanency of constitutional language and may be overruled. The objective of the second sentence—harmonization of other provisions of the constitution with the meaning of the first sentence—will be achieved in any event, for a specific amendment controls other more general provisions with which it might conflict. *Johns v. Commercial Fisheries Entry Comm'n,* 758 P.2d 1256, 1264 (Alaska 1988); *State v. Ostrosky,* 667 P.2d 1184, 1190 (Alaska 1983). Impelled by these considerations we believe that deletion of the second sentence is appropriate.

12. *Legislative Resolve No. 74.* This measure would amend article VI of the Alaska Constitution concerning the apportionment of House and Senate districts. Currently reapportionment is a function performed by the Governor. Under the proposed amendment the function would be performed by a board consisting of five members, two appointed by the Governor, one appointed by the presiding officer of the Senate, one by the presiding officer of the House of Representatives, and one by the Chief Justice of the Supreme Court. 1998 Legislative Resolve No. 74 (SCS CSHJR

44). It is our view that this resolve reflects an appropriate exercise of the amendatory power. While the change is an important one, it is simple to express and understand. It is complete within itself, relates to only one subject, and does not substantially affect numerous other sections of the constitution.

13. The appellants also argue that the three ballot propositions should be considered in the aggregate to be beyond the constitutional amendatory process. We reject this argument, for the measures lack substantial relationship to each other and are proposed for separate and independent approval. *Cf. Rivera–Cruz v. Gray,* 104 So.2d 501 (Fla.1958) (discussing "daisy chain" argument).

14. In addition to the point that the measures are beyond the amendatory process, the parties raise two other process-related issues which are appropriate for decision prior to the election. These are whether the propositions violate a constitutional one-subject requirement and whether the Lieutenant Governor's summary is fair and impartial. The Legislative Council also objects to the summary as not fair and impartial. We have examined these claims and find them to be without merit. However, the final sentence of the summary regarding marriage must be deleted in conformity with our decision regarding that measure.

15. Appellants' remaining claims are inappropriate for a pre-election challenge.

*ORDER*

1. Legislative Resolve No. 59 shall not be placed on the ballot.

2. The second sentence of the amendment proposed by Legislative Resolve No. 71 shall not be placed on the ballot. To conform with this change the last sentence of the Lieutenant Governor's summary shall be deleted.

3. Legislative Resolve No. 74 shall be placed on the ballot.

4. An opinion will follow.

Entered at the direction of the court.

COMPTON, Justice, dissenting, in part.

The court concludes that the words "amend" and "revise," as used in article XIII of the Alaska Constitution, indeed have a different meaning. I agree. It also concludes that the proposed changes to the constitution relating to prisoners and the definition of marriage are, in whole or in part, "revisions" to the constitution and hence cannot be placed on the ballot by legislative action; only a constitutional convention can act to place these issues before the voters. I also agree. However, the court concludes that the proposed change relating to the manner by which reapportionment is accomplished is merely an "amendment." By any measure this seems unsupportable; it is particularly so in light of the court's conclusions with respect to constitutional "revisions" regarding prisoners and the definition of marriage. Therefore, I dissent from the court's conclusion regarding this issue.

The Alaska Constitution provides for a chief executive with strong powers, one of which is the power to shape the composition of the reapportionment board. Effectively, this is the power to shape the composition of the legislature itself. Indeed, Alaska's is probably the only state constitution that grants its chief executive such broad power over reapportionment. The chief executive's constitutional powers, including the power over reapportionment, were among the most debated, if not the most debated, issues at Alaska's Constitutional Convention. To now permit this issue to be brought before the voters through legislative action as a constitutional "amendment" ignores the importance which the Constitutional Convention gave to this issue, and the pervasive effect the transfer of so much constitutional power from the chief executive to the legislature will have on the manner by which voters are grouped together to elect legislators. Moreover, not only will the "amendment" divest the chief executive of much of the constitutional power that office has held since statehood, and invest the legislature with a constitutional power heretofore unknown to it, but

also it will bring the judiciary into the reapportionment process in a manner which is potentially highly political. The fact that the very persons whose interests are the most directly affected by this "amendment" are the persons who have brought the issue to the voters by the least restrictive, least impartial, and most politically sensitive process, should not be ignored.

The proposed constitutional "revision" regarding prisoners affects a narrow class of persons comparatively few in number. Yet because it implicates numerous state constitutional provisions, and divests prisoners of state constitutional protections, we conclude that it is a constitutional "revision" that cannot be brought before the voters as a constitutional "amendment" initiated by legislative action.[1] On the other hand, we conclude that the proposed change regarding reapportionment, which fundamentally redistributes among all three branches of government constitutional power previously held by the chief executive alone, impacts all voters within the state, and restructures the manner by which the voters are grouped together to elect their legislators, is a mere constitutional "amendment" undeserving of the politically impartial deliberation inherent in the constitutional convention process. The irony is remarkable.

---

1. In concluding that Legislative Resolve No. 74 is an "amendment" and not a "revision," the court observes that "[w]hile the change is an important one, it is simple to express and understand. It is complete within itself, relates to only one subject, and does not substantially affect numerous sections of the constitution." Except for the "does not substantially affect" phrase, which relates to the numerous constitutional provisions that will be affected, what could be more easily expressed and understood than that the rights of prisoners under the Alaska Constitution shall be limited to those afforded by the Constitution of the United States?